Larry **FLYNT** and LFP,
Inc., Plaintiffs,

v.

Donald H. **RUMSFELD**, Secretary of Defense, and United States Department of Defense, Defendants.

No. CIV.A. 01–2399(PLF).

United States District Court, District of Columbia.

Feb. 19, 2003.

---

John Perazich, Washington, DC, Roger W. Wilcox, Paul J. Cambria, Jr., Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria LLP, Buffalo, NY, for Plaintiffs.

John R. Griffiths, U.S. Department of Justice Civil Division, David Jay Anderson, U.S. Department of Justice Federal Programs Branch, Vincent Morgan Garvey, U.S. Department of Justice Civil Division, Federal Programs Branch, Washington, DC, for Defendants.

## OPINION

PAUL L. FRIEDMAN, District Judge.

This matter is before the Court for consideration of defendants' motion to dismiss plaintiffs' amended complaint or, in the alternative, for summary judgment. Plaintiffs previously moved for a preliminary injunction against Secretary of Defense Donald H. Rumsfeld and the United States Department of Defense, alleging that defendants were restraining their

First Amendment right to have *Hustler Magazine* correspondents accompany American troops in combat on the ground in Afghanistan; the Court denied plaintiffs' motion. *See Flynt v. Rumsfeld,* 180 F.Supp.2d 174 (D.D.C.2002) (*"Flynt I "*). After full briefing, the Court heard argument on defendants' motion to dismiss the amended complaint on May 8, 2002. Upon consideration of the arguments of the parties in their papers and in court, the Court grants defendants' motion to dismiss.

## I. BACKGROUND

### A. *Plaintiffs' Request for Access*

Plaintiffs contend that defendants have refused and continue to refuse to allow them access to the battlefield to report on the activities of U.S. troops engaged in ground combat in Afghanistan, in violation of their First Amendment right. On October 30, 2001, plaintiffs wrote a letter to Assistant Secretary of Defense Victoria Clarke asking that "Hustler correspondents be allowed to accompany and cover American ground forces in Afghanistan and wherever else such forces may be utilized in this campaign against terrorism." Amended Complaint, Ex. A, October 30, 2001, Letter from Larry Flynt to Assistant Secretary Victoria Clarke ("Letter of Oct. 30, 2001") at 2. After receiving no response from defendants, plaintiffs sent a second letter requesting the identical access. *See* Amended Complaint, Ex. B., November 12, 2001, Letter from Larry Flynt to Assistant Secretary Victoria Clarke ("Letter of Nov. 12, 2001"). On November 15, 2001, defendants transmitted a fax to plaintiffs in response to the two letters, in which Assistant Secretary Clark stated that defendants already had provided "extensive access to military operations thus far in the war on terrorism," including press coverage of air strikes, humanitarian relief and interviews with U.S.

troops serving in the region. *See* Amended Complaint, Ex. C, November 15, 2001, Fax from Assistant Secretary Victoria Clarke to Larry Flynt ("Fax of November 15, 2001" or "Fax"). She also explained that:

A particular challenge right now is that the only U.S. troops on the ground in Afghanistan are small numbers of servicemen involved in special operations activity. The highly dangerous and unique nature of their work makes it very difficult to embed media. We're exploring many options, however, and remain hopeful that we can facilitate some aspect of special operations activities.

*Id.* Assistant Secretary Clarke provided plaintiffs with the contact information for Commander Jeff Alderson, the commander in the region who was coordinating media requests. *Id.* At the time of the hearing on the motion for preliminary injunction, plaintiffs had not contacted Commander Alderson to make arrangements for sending a correspondent to the region.

After the Court denied plaintiffs' request for a preliminary injunction but before plaintiffs filed the amended complaint, plaintiffs wrote Assistant Secretary Clarke another letter, again requesting access to actual battlefield combat activities subject to "any such regulations reasonably deemed necessary to advance military operational security in a material way." Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment ("Defs.' Mot."), Ex. A, January 15, 2002, Letter from Larry Flynt to Assistant Secretary Victoria Clarke ("Letter of Jan. 15, 2002") at 2. In this letter, plaintiffs stated that they had not contacted Commander Alderson as suggested in the Fax of November 15, 2001 because they had not requested the type of access defendants had indicated was available. Rather, plaintiffs assert-

ed, they "specifically requested reporter access to actual battlefield combat activities," and specifically renewed their request to have a reporter "accompany ground troops in order to cover actual combat activity carried out in connection with the current military campaign known as Operation Enduring Freedom." *Id.* In response to this letter and a follow-up letter plaintiffs sent on January 30, 2002, defendants reiterated their position that they are willing to provide "extensive access to [U.S.] operations" and that the *Hustler* correspondent just needs to "work with our people on the ground." Defs.' Mot., Ex. C, February 4, 2002, Letter from Assistant Secretary Victoria Clarke to Larry Flynt ("Letter of Feb. 4, 2002"). With this letter, defendants sent plaintiffs a two-page list of public affairs contacts in the military in connection with Operation Enduring Freedom, with telephone numbers and email addresses, so that plaintiffs could arrange for access to U.S. troops. *See id.*

Several weeks later, responding to an email requesting access to U.S. ground troops engaged in combat operations, Lt. Colonel Bonnie Hébert emailed Roger Wilcox, plaintiffs' counsel, to obtain additional details about plaintiffs' request. *See* Supplemental Memorandum in Support of Defendants' Motion to Dismiss ("Defs.' Supp. Mem."), Ex. A, February 22, 2002, Email from Lt. Colonel Bonnie Hébert to Roger Wilcox ("Email of Feb. 22, 2002"). On March 2, 2002, Sergeant Aaron Lawrence emailed Mr. Wilcox setting forth some options for placing a reporter in Afghanistan, which included details on the locations at which a reporter would be most likely to have the opportunity to embed with combat soldiers. *See* Defs.' Supp. Mem., Ex. B, March 2, 2002, Email from Sergeant Aaron Lawrence to Roger Wilcox ("Email of March 2, 2002").

On March 8, 2002, David Buchbinder, a correspondent reporting on the conflict in Afghanistan for *Hustler*, emailed Sergeant Lawrence explaining that he wanted to stay with soldiers stationed at military bases in Afghanistan and accompany troops on combat missions. *See* Defs.' Supp. Mem., Ex. C, March 8, 2002, Email from David Buchbinder to Sergeant Aaron Lawrence ("Email of March 8, 2002"). Mr. Buchbinder also requested additional contact information for military media liaisons on the ground in Afghanistan. *See id.* Defendants provided this contact information to plaintiffs in a letter from Lt. Colonel Hébert to Allen MacDonell of LFP, Inc. and again indicated the likely location of combat troops with which Mr. Buchbinder could embed. *See* Defs.' Supp. Mem., Ex. D, March 15, 2002, Letter from Lt. Colonel Bonnie Hébert to Allen MacDonell ("Letter of March 15, 2002").

On May 7, 2002 Mr. Buchbinder filed an affidavit in this action stating that he was in Afghanistan on Bragram Air Base, and had placed himself on the requisite waiting list for journalists requesting access to conventional combat missions. *See* Plaintiff's Motion for Leave to File Supplemental Affidavit of David Buchbinder in Support of Their Response to Defendants' Supplemental Memorandum in Support of Defendants' Motion to Dismiss, Ex. A, Declaration of David Buchbinder ("Buchbinder Aff.") ¶¶ 1, 12. Mr. Buchbinder also stated that he had made a request to the appropriate authority to accompany special forces operations, and had been informed by Major Bryan Hilferty that Defense Department officials were awaiting approval from the United States to allow reporters to accompany special forces on missions. *See id.* ¶¶ 24, 35. If the Defense Department received approval, Major Hilferty informed Mr. Buchbinder, the major would consult the same waiting list created for journalists wishing

to embed with conventional combat troops, on which Mr. Buchbinder currently was listed, in order to determine which reporters would accompany special forces on their missions. *See id.* ¶ 37. At the time of his affidavit, Mr. Buchbinder had not accompanied soldiers on any missions, although he had received word from defendants that specific efforts were being made to place him with ground troops and that his placement on the list was rising. *See id.* ¶¶ 40–46.

### B. *Department of Defense Directive 5122.5*

Defendants announced the Defense Department's policy on media access in Department of Defense Directive Number 5122.5. *See* Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Defs.' PI Mem."), Ex. B, Department of Defense Directive 5122.5 (Sept. 27, 2000). The Directive confers on the Assistant Secretary of Defense for Public Affairs the responsibility of ensuring "a free flow of news and information to the news media [and] the general public, . . . limited only by national security constraints" and outlines the Assistant Secretary's responsibilities, functions and authority. *Id.* ¶¶ 3.2, 1. Enclosures 2 and 3 to the Directive "delineate principles that guide the Department regarding public access to information and media coverage of DoD activities." *Id.* ¶ 3.2.

Enclosure 2 is entitled "Principles of Information." Enclosure 3, entitled "Statement of DoD Principles for News Media," affirms that "[o]pen and independent reporting shall be the principal means of coverage of U.S. military operations." *See* Defs.' PI Mem., Ex. B, Department of Defense Directive 5122.5, Enclosure 3, Statement of DoD Principle for News Media ("Enclosure 3") ¶ E3.1.1. Under conditions of open coverage, "field commanders should be instructed to permit journalists to ride on military vehicles and aircraft when possible." *See id.* ¶ E.3.1.7. While media pools may be used, in which "a limited number of news media [represent] a larger number of news media organizations for news gatherings and sharing of material during a specified activity," they "are not to serve as the standard means of covering U.S. military operations." *See id.* ¶ E3.1.2. Journalists "in a combat zone shall be credentialed by the U.S. military and shall be required to abide by a clear set of military security ground rules that protect U.S. Armed Forces and their operations." *See id.* ¶ 3.1.4. Journalists "shall be provided access to all major military units," but "[s]pecial operations restrictions may limit access in some cases." *See id.* ¶ E.3.1.5. News organizations "shall make their best efforts to assign experienced journalists to combat operations and to make them familiar with U.S. military operations." *See id.* ¶ E.3.1.4.

At the heart of this action lies plaintiffs' charge that Department of Defense Directive 5122.5 and Enclosure 3 in particular violate a First Amendment right—or a "qualified First Amendment right"—of media access to the battlefield. Plaintiffs' claims fall into two distinct categories: (1) claims charging that defendants violated plaintiffs' First Amendment right while operating under Enclosure 3 by improperly denying a *Hustler* correspondent the right to accompany combat forces on the ground in Afghanistan (the "as-applied" claims); and (2) claims asserting that Enclosure 3 is facially unconstitutional under the First and Fifth Amendments (the "facial challenge" claims).

## II. DISCUSSION

### A. *Motion to Dismiss*

A motion to dismiss should not be granted unless plaintiffs can demonstrate no set

of facts that supports their claim entitling them to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111, 1117 (D.C.Cir.2000). In evaluating the motion to dismiss, the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of plaintiffs. *See Harris v. Ladner,* 127 F.3d 1121, 1123 (D.C.Cir.1997). While the complaint is to be construed liberally, the Court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept the plaintiffs' legal conclusions. *See National Treasury Employees Union v. United States,* 101 F.3d 1423, 1430 (D.C.Cir.1996); *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994).

Although a district court may dispose of a motion to dismiss on the basis of the complaint alone, a court may consider materials beyond the pleadings when evaluating a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. "[W]here necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed fact plus the court's resolution of disputed facts." *Herbert v. National Academy of Sciences,* 974 F.2d 192, 197 (D.C.Cir.1992). This Court has interpreted *Herbert* to allow a court to "consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections and Ethics,* 104 F.Supp.2d 18, 22 (D.D.C.2000) (Kennedy, J.) (citing *Herbert v. National Academy of*

*Sciences,* 974 F.2d at 197), *aff'd Scolaro v. D.C. Bd. of Elections and Ethics,* No. 00–7176, 2001 WL 135857, at *1 (D.C.Cir. Jan. 18, 2001); *see also Ass'n of Merger Dealers, LLC v. Tosco Corp.,* 167 F.Supp.2d 65, 69 (D.D.C.2001) (Hogan, C.J.) (same); *Rann v. Chao,* 154 F.Supp.2d 61, 64 (D.D.C.2001) (Urbina, J.) (same).[1]

### B. *Plaintiffs' As–Applied Claims*

In their Amended Complaint, plaintiffs assert that a First Amendment right of press access exists and that defendants violated that right when they denied plaintiffs' request for access to the battlefield in Afghanistan. *See* Amended Complaint, Claims 1–3, 8–9, and those portions of Claims 4–7 that allege that defendants applied Enclosure 3 in denying plaintiffs' request for access. In response, defendants argue that the Court lacks subject matter jurisdiction to consider the as-applied claims because the claims are unripe and because plaintiffs lack standing to bring suit. They also urge the Court to defer to the Executive Branch under the political question doctrine. Defendants then assert that the Amended Complaint fails to state a claim for which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Court finds it unnecessary to consider whether the as-applied claims are viable and thus survive a Rule 12(b)(6) motion, because the Court agrees with defendants that it does not have jurisdiction to consider these claims.

#### 1. Ripeness

The ripeness doctrine "limits the power of federal courts in adjudicating disputes. Its roots are found in both the Article III requirement of 'case or controversy' and prudential considerations favoring the orderly conduct of the administra-

---

1. In this case, both plaintiffs and defendants have filed affidavits, correspondence and other supplemental materials that contain largely undisputed facts. The Court finds it helpful and productive to consider these materials in analyzing the jurisdictional issues presented.

tive and judicial processes." *State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 479 (D.C.Cir.1986). To meet the Article III requirements of ripeness in the context of a challenge to an administrative action, a plaintiff must demonstrate both (1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). In evaluating such a challenge, a court must consider whether judicial intervention would inappropriately interfere with further administrative action, whether the court would benefit from further factual development of the issues, and whether delayed review would cause hardship to the plaintiffs. *See Wyoming Outdoor Council v. U.S. Forest Service*, 165 F.3d 43, 48–49 (D.C.Cir.1999) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998)). Sometimes the issue presented is a purely legal question, allowing for decision without the need for additional development of the factual record, but the case generally is not fit for review if the agency has not made a final decision on the matter before it. *See State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d at 479. The ripeness doctrine prevents the courts through premature adjudication "from entangling themselves in abstract disagreements over administrative policies," and it "protects agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. at 148–49, 87 S.Ct. 1507.

■ Plaintiffs assert that their as-applied claims are ripe because defendants denied their request to place a *Hustler* correspondent with combat forces on the battlefield in Afghanistan. Specifically, plaintiffs allege that defendants' failure to grant their request to allow a *Hustler* correspondent to accompany American soldiers in battle, demonstrated by the Fax of November 15, 2001, constituted a denial of plaintiffs' request. *See* Amended Complaint ¶ 80. The Court concludes, however, that plaintiffs' as-applied claims are not fit for judicial decision at this juncture because defendants have not made a final decision with respect to plaintiffs' request for access to combat ground forces in battle. Further development of the facts is necessary to prevent the Court from issuing an advisory opinion on the claims plaintiffs raise.

Certainly plaintiffs are correct that the Fax of Nov. 15, 2001 did not explicitly grant them access to ground troops on combat missions in Afghanistan. The absence of an explicit grant of access, however, did not constitute a denial of access sufficient to serve as a final agency decision ripe for judicial review. The Fax of Nov. 15, 2001 informed plaintiffs that access to ground forces was not available at that time because the only troops on the ground were special operations forces, whose activities made it difficult for defendants to embed journalists with them. *See* Fax of Nov. 15, 2001 at 2.[2] Defendants did not comply with plaintiffs' specific request

---

2. Plaintiffs make assertions in their briefs that combat ground forces operations were taking place at the time of plaintiffs' first request in October 2001. *See* Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment ("Pls.' Mem.") at 4, 21. The Amended Complaint and subsequent factual filings by plaintiffs, however, do not contain any allegations of such troop movement at that time. In addition, plaintiffs do not challenge defendants' claim that special operations forces were unavailable for embedment at the time of plaintiffs' initial requests.

for access to ground troops because such access was not available in the Afghan theater at that time, not because defendants had determined that plaintiffs should not be granted that access. *See id.* The Fax also informed plaintiffs that defendants were exploring various options and were hopeful that facilitation of access to some aspect of special forces activities would take place. *See id.*

The record before the Court reflects no final decision with respect to plaintiffs' request for access to ground troops at the time of the Fax of November 15, 2001. Instead, it reflects the shifting scenery of the Afghan theater and the status of Defense Department attempts to place media in the area. As Commander Alderson explained in his December 10, 2001 declaration: "The military situation in and around Afghanistan has been a rapidly changing, fluid environment and so the support for press coverage has passed through several phases." Defs.' PI Mem, Ex. E, Declaration of William Jeffrey Alderson ¶ 3. By May of 2002, when *Hustler*'s David Buchbinder executed his affidavit, defendants still had not denied plaintiffs the access they sought. Indeed, Mr. Buchbinder was on a list with other journalists eligible to accompany troops and his placement on the list was rising. Buchbinder Aff. ¶¶ 37, 42, 43. Absent a final agency decision denying plaintiffs' request for access, plaintiffs' as-applied claims based on this alleged denial are unfit for adjudication.

The Court also rejects plaintiffs' argument that a ripe case or controversy exists now because the parties disagree as to whether there is a First Amendment right of media access to the battlefield and because plaintiffs' initial request for access was specifically access pursuant to the First Amendment. *See* Plaintiffs' Memorandum in Response to Defendants' Supplemental Memorandum in Support of De-

fendants' Motion to Dismiss ("Pls.' Supp. Mem.") at 2. Even if defendants provide access, plaintiffs argue, they will do so without acknowledging that a First Amendment right to media access to the battlefield exists, thereby effectively denying plaintiffs' precise request. *See id.* Plaintiffs' effort to parse their argument in order to craft a ripe as-applied claim falls short. The mere existence of a legal disagreement about the scope of the First Amendment does not make that disagreement fit for judicial review. *See id.* at 149, 87 S.Ct. 1507. Courts do not function to provide advisory opinions ungrounded in the rights of an injured party. *See Abbott Laboratories v. Gardner,* 387 U.S. at 148–49, 87 S.Ct. 1507. If plaintiffs are granted access to combat forces, there will no denial of access and therefore no claim based on that denial for the Court to adjudicate.

█ Nor will plaintiffs suffer any hardship by this Court's declining to consider their as-applied claims now. As discussed above, the Court has concluded that plaintiffs have not adequately alleged that defendants have in fact denied them access to the battlefield. Furthermore, plaintiffs' subsequent efforts to secure access to combat ground forces even as they sought relief before the Court demonstrate that the issues are in flux and that plaintiff has not yet been harmed by an agency decision. The correspondence exchanged between plaintiffs and defendants after plaintiffs filed their Amended Complaint reveals that plaintiffs are continuing their effort to gain access to combat troops through military channels that very well may result in access. Indeed, as of May 7, 2002, Mr. Buchbinder was in line to accompany conventional forces on a combat mission and had received word from defendants that specific efforts were being made to place him with British forces in the interim. *See* Buchbinder Aff. ¶¶ 40–

45. The record before the Court thus demonstrates that it is possible if not probable that Mr. Buchbinder will be granted access to combat ground forces. In these circumstances, any theoretical hardship to plaintiffs caused by defendants' delay in reaching a final decision does not outweigh the Court's and defendants' interest in postponing review. *See Louisiana Environmental Action Network v. Browner,* 87 F.3d 1379, 1385 (D.C.Cir.1996) (quoting *State Farm Mut. Auto. Ins. Co. v. Dole,* 802 F.2d at 479–80) (If a court "confronts an institutional reason why it should not review a petitioner's claim at that time, the court should reject the claim as not ripe unless 'postponing review .... imposes a hardship on the complaining party that is immediate, direct, and significant'.").[3]

### 2. Standing

■ Defendants also assert that plaintiffs lack Article III standing to bring their as-applied claims before the Court. To meet the Article III requirements of standing, a plaintiff must show: (1) that it has suffered an injury in fact, the invasion of a legally protected interest; (2) that the injury is fairly traceable to the defendant's conduct (a causal connection); and (3) that a favorable decision on the merits likely will redress the injury. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Mudd v. White,* 309 F.3d 819, 823 (D.C.Cir.2002); *Gettman v. DEA,* 290 F.3d 430, 433 (D.C.Cir.2002). The alleged injury in fact must be concrete and particularized and actual or imminent, not conjectur-

al, hypothetical or speculative. *See Lujan v. Defenders of Wildlife,* 504 U.S. at 560–561, 112 S.Ct. 2130; *Sierra Club v. EPA,* 292 F.3d 895, 898 (D.C.Cir.2002); *American Petroleum Institute v. EPA,* 216 F.3d 50, 63 (D.C.Cir.2000). The standing inquiry is particularly rigorous when a court is considering the asserted unconstitutionality of actions taken by another branch of the government. *See Raines v. Byrd,* 521 U.S. 811, 819, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). If plaintiff cannot meet all three prongs of the standing test, then the Court must dismiss the suit for lack of constitutional standing.

■ Plaintiffs assert that "[d]efendants' refusal to grant the requested permission to cover the activities of American soldiers on the ground in Afghanistan constitutes a denial of Plaintiff's request" and that such denial caused injury to plaintiffs. Amended Complaint ¶ 80. As the Court concluded in its analysis of ripeness, however, plaintiffs have not adequately shown that defendants have in fact denied plaintiffs' request for access to ground forces in combat in Afghanistan. Thus, they cannot demonstrate that they have suffered an injury in fact as a result of such a denial, the first prong of the standing test. The Court therefore concludes that plaintiffs lack standing to bring their as-applied claims.

### C. *Plaintiffs' Facial Challenge Claims*

In Claims 4 through 7 of the Amended Complaint, plaintiffs assert that Enclosure 3 to Department of Defense Directive 5122.5 is facially invalid under the First

---

**3.** Although the Court concludes that the issue of media access is not yet ripe, in part because plaintiffs have not demonstrated that defendants denied plaintiffs' request for access to ground forces, this decision by no means allows defendants to obfuscate or prolong their decision-making in order to keep plaintiffs' claims from ultimate resolution by a court. If there were a showing that defendants were taking no steps to deal with plaintiffs' requests or had acted arbitrarily or had treated these plaintiffs differently from other members of the media, a different result might pertain.

and Fifth Amendments to the Constitution because it: (1) fails "to acknowledge and protect Plaintiffs' fundamental right of access to overt combat activities of American troops, as guaranteed by the First Amendment" (Amended Complaint, Claim 4, ¶ 117); (2) does not contain "definite and objective standards for use in determining Plaintiffs' request for press access," thereby providing defendants "unfettered discretion" to deny press access requests by Plaintiffs for "any reason or for no reason," or for "arbitrary, capricious or discriminatory reasons" (*id.*, Claim 5, ¶¶ 122–124); (3) does not require defendants to issue a decision on plaintiffs' press access request "within a constitutionally permissible period of time," thereby allowing the "suppression of Plaintiffs' First Amendment rights by official inaction or delay on their request" (*id.*, Claim 6, ¶¶ 130, 132); and (4) does not provide for "prompt administrative appeal of Defendants' denial of Plaintiffs' request for access" in violation of plaintiffs' First and Fifth Amendment rights (*id.*, Claim 7, ¶¶ 137–138).

Defendants move to dismiss plaintiffs' facial challenges to Enclosure 3 on four grounds, the first three of which may be considered jurisdictional in nature under Rule 12(b)(1) of the Federal Rules of Civil Procedure. First, defendants move to dismiss the claims under the prudential aspects of the ripeness doctrine. Second, defendants argue that the facial challenge claims are non-justiciable under the political question doctrine. Third, they urge the Court (if it otherwise finds jurisdiction over the facial challenge claims) to exercise its discretion by declining to apply the Declaratory Judgment Act, 28 U.S.C. § 2201(a). Finally, defendants move to dismiss Claims 4–7 for failure to state a

claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. In view of its decision on the jurisdictional arguments, the Court does not reach this last point.

### 1. Prudential Ripeness

In mounting their facial challenge to Enclosure 3, plaintiffs assert that the enclosure "acts as a licensing requirement which imposes a requirement that plaintiffs obtain permission from defendants before exercising their First Amendment right to gather news on the battle field." Pls.' Mem. at 43. They rely on the decision of the Supreme Court in *City of Lakewood v. Plain Dealer Publishing Co.*, in which the court held that "when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 755–756, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). Recognizing that plaintiffs may be correct that they do not have to allege that defendants actually applied Enclosure 3 in order to assert a facial challenge under this theory, defendants nevertheless seek dismissal under prudential ripeness considerations.[4]

The Supreme Court and the courts of appeals have extended both the ripeness and standing doctrines beyond a strict Article III constitutional analysis to ensure that the prudential policies underlying the doctrines properly are protected. *See Wyoming Outdoor Council v. United States Forest Service*, 165 F.3d at 48 (even where the constitutional requisites for standing or ripeness are present, a party may still lack standing or a case may not be ripe for adjudication "under 'prudential' princi-

---

**4.** Defendants concede that plaintiffs' facial challenge claims by their nature are more likely to withstand a ripeness challenge. *See*

Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment ("Defs.' Mem.") at 35.

ples."). Prudential considerations serve to restrain courts "from hastily intervening into matters that may be best viewed at another time or another setting, especially when the uncertain nature of an issue might affect a court's ability to decide intelligently." *Id.* at 50 (quoting *Louisiana Environmental Action Network v. Browner*, 87 F.3d at 1382) (internal quotation omitted). "Like their constitutional counterparts, these 'judicially self-imposed limits on the exercise of federal jurisdiction' are 'founded in concern about the proper—and properly limited—role of the courts in a democratic society.'" *Mudd v. White*, 309 F.3d at 823 (quoting *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)). To determine if prudential considerations dictate dismissal, a court must analyze the interests of the parties through essentially the same lenses as it does when examining constitutional ripeness, balancing "the petitioner's interest in prompt consideration of the allegedly unlawful agency decision against the agency's interest in crystallizing its policy before that policy is subjected to judicial review[,] and the court's interest in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *Eagle–Picher Industries v. EPA*, 759 F.2d 905, 915 (D.C.Cir.1985); *see also Wyoming Outdoor Council v. United States Forest Service*, 165 F.3d at 48–49.

 In the context of plaintiffs' particular facial challenge to Enclosure 3, two of the traditional factors used to evaluate ripeness are inapposite, or weigh in favor of adjudication. Plaintiffs' interest in prompt consideration of the agency decision is predetermined, and the Department of Defense already has crystallized its policies as evidenced in Enclosure 3. *See Eagle*

*Picher Industries v. EPA*, 759 F.2d at 915. As for the third factor, while the Court may have a significant interest in postponing adjudication of plaintiffs' facial challenge claims, *see National Treasury Employees Union v. United States*, 101 F.3d at 1431 ("[i]f we do not decide it now, we may never have to") and *supra* at 102–103, the posture of these particular claims make it inappropriate to dismiss on prudential ripeness grounds.

### 2. The Political Question Doctrine

 Defendants next argue that plaintiffs' facial challenge claims raise non-justiciable political questions, the examination of which should be left to the Executive Branch consistent with powers designated to the President under Article II, Section 2 of the Constitution.[5] The political question doctrine exists to remove certain political questions from judicial scrutiny, "because [political questions] invite courts to intrude into the province of coordinate branches of government, [and] because courts are fundamentally underequipped to formulate national policies or develop standards of conduct for matters not legal in nature." *U.S. ex rel Joseph v. Cannon*, 642 F.2d 1373, 1379 (D.C.Cir.1981). Defendants assert that plaintiffs' challenges to the formulation of guidelines for processing media requests for access to the battlefield should be left to the Executive Branch, and that any judicial examination of such guidelines would improperly infringe on the President's constitutional mandate as Commander in Chief. Defendants also assert that consideration of Claims 4–7 involve questions the judiciary does not have the expertise to resolve. *See* Defs.' Mem. at 15–16.

---

5. Article II, Section 2, Clause 1 states that "the President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several states, when called into actual service of the United States." U.S. CONST. art. II, § 2, cl. 1.

In evaluating defendants' argument, the Court must consider (1) whether the issues involve "resolution of questions committed by the text of the Constitution to a coordinate branch of Government," (2) whether resolution of the questions presented would demand that the Court "move beyond areas of judicial expertise," and (3) whether "prudential considerations counsel against judicial intervention." *Goldwater v. Carter*, 444 U.S. 996, 998, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) (Powell, J., concurring) (citing *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). *See also Antolok v. United States*, 873 F.2d 369, 380–382 (D.C.Cir.1989) (analyzing political question doctrine in context of foreign relations). In answering these questions in a case that closely parallels this action, Judge Sand declined to find that the issues presented were non-justiciable under the political question doctrine. *See Nation Magazine v. Department of Defense*, 762 F.Supp. 1558 (S.D.N.Y.1991). In that case, as here, plaintiffs alleged that the Department of Defense had improperly denied plaintiffs access to media pools in the Persian Gulf in violation of a First Amendment media right of access to the battlefield and, more broadly, that the guidelines the Defense Department used in determining pool access infringed on this alleged protected right of access. The defendants asserted that the issue was non-justiciable in light of the deference usually accorded to military decisions. *Id.* at 1566.

Acknowledging that a court does not have the power to review tactical military decisions the examination of which could jeopardize covert military operations, Judge Sand nevertheless found that the regulations at issue "do not represent a fact-specific tactical or strategic decision, but rather are 'blanket' regulations which apply with equal force to access to battlefields where overt actions are in progress." *Nation Magazine v. Department of Defense*, 762 F.Supp. at 1566. In contrast to those cases in which the Supreme Court had found that the political question doctrine removed from the purview of the courts challenges to certain military decisions, Judge Sand determined that the plaintiffs' claims did not raise a challenge "to this country's military establishment, its goals, directives or tactics." *Id.* at 1567. As such, the President's Article II powers as Commander in Chief "are not implicated because resolution of the question does not impact upon the internal functioning and operation of the military." *Id.* In addition, the examination of media access guidelines does not "interfere with United States relations with a foreign power in as much as it concerns examination of the management of American press covering United States military operations." *See id.* Judge Sand concluded that the constitutional protections underlying the plaintiffs' claim—First Amendment freedoms and Fifth Amendment equal protection—are clearly subjects the judiciary is competent to consider. *See id.*

As in the case before Judge Sand, the defendants here misconstrue plaintiffs' facial challenge claims when they argue that decisions regarding media access necessarily challenge the manner in which the military operates during battle and when they suggest that the Court would have to evaluate defendants' exercise of their discretion under the broad obligations to defend the country and command military forces. *See* Defs.' Mem. at 17.[6] Defendants also

---

**6.** As an initial matter, defendants incorrectly characterize the regulations at issue in *Nation Magazine* as barring the press from an entire geographic area. Apparently, defendants make this argument in an attempt to distinguish the guidelines at issue there from the

are wrong when they assert that plaintiffs' claims go directly to the heart of the military's "goals, directives and tactics" by challenging defendants' determinations as to who may enter a combat zone or accompany U.S. troops into battle. *See id.* at 17, n. 6. In their facial challenge claims plaintiffs do not ask the Court to delve into tactical decisions made by defendants. They ask the Court only to consider whether a First Amendment right of media access to the battlefield exists—a right they themselves characterize as a "qualified right of access" subject to reasonable Executive Branch regulations—and, if so, to direct defendants to enact guidelines that comport with such First Amendment protections; plaintiffs maintain that the current guidelines do not. Such questions neither directly implicate the President's activities as Commander in Chief or the authority of the Secretary of Defense to direct military actions, nor do they require the Court to range beyond the limits of normal judicial competence. To decide this case, the Court need only "apply normal principles of interpretation to the constitutional provisions at issue." *Goldwater v. Carter,* 444 U.S. at 999, 100 S.Ct. 533 (Powell, J., concurring); *see Nation Magazine v. Department of Defense,* 762 F.Supp. at 1567 ("The historic competence of the federal judiciary to address questions of First Amendment freedoms and equal protection is clear.").[7]

Having determined that plaintiffs' claims should not be dismissed as prudentially unripe or as non-justiciable, the Court concludes that it has jurisdiction to hear plaintiffs' facial challenge claims. This does not necessarily result, however, in adjudication of plaintiffs' claims on the merits at this time.

### 3. Declaratory Relief

■■■■ The Declaratory Judgment Act, 28 U.S.C. § 2201(a), is an "enabling" act that confers discretion on a court "rather than an absolute right upon the litigant." *Wilton v. Seven Falls Co.,* 515 U.S. 277, 287, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995). Emphasizing the discretionary nature of the Act, the Supreme Court in *Wilton* held that district courts may decline to exercise their discretion to entertain an action "even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Id.* at 282, 115 S.Ct. 2137; *see also Mittleman v. United States Dep't of the Treasury,* 919 F.Supp. 461, 470 (D.D.C.1995). "When all is said and done, ... 'the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power.'" *Wilton v. Seven Falls Co.,* 515 U.S. at 282, 115 S.Ct. 2137 (quoting *Public Serv. Comm'n of Utah v. Wycoff Co.,* 344 U.S. 237, 243, 73 S.Ct. 236, 97 L.Ed. 291 (1952)). As a result, "the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise ju-

---

instant circumstances in which Enclosure 3 addresses individualized entry into the military theater. *See* Defs.' Mem.. at 17, n. 6. Like plaintiffs in this case, however, the plaintiffs in *Nation Magazine* challenged regulations that concerned individual journalists' access to the battlefield.

7. The Court's consideration of plaintiffs' First Amendment claims could, of course, be conducted with appropriate deference to the ex-

pertise of the Department of Defense, where such deference is warranted. *See e.g., Stillman v. Department of Defense,* 209 F.Supp.2d 185, 204 (D.D.C.2002) (in rejecting claim that review of government decision determining access to classified documents is non-justiciable, court concluded that it has the ability to adjudicate intertwined First Amendment issue without impinging on Executive Branch discretion and expertise).

dicial administration." *Id.* at 288, 115 S.Ct. 2137.

In deciding whether to exercise its discretion under the Declaratory Judgment Act, it is worthwhile for the Court to examine the path it would have to take in assessing the merits of plaintiffs' facial challenge claims. First, the Court would have to determine whether plaintiffs' analogy to licensing requirements in the current context is appropriate, or instead is an unwarranted extension of Supreme Court precedent. The policy behind allowing facial challenges to licensing statutes is that such laws impose prior restraints on speech, making it unlikely for "as-applied" claims ever to ripen, and very likely that the regulators' discretionary decisions are effectively unreviewable. In *City of Lakewood v. Plain Dealer Publishing Co.*, the seminal facial challenge decision, the Supreme Court identified "two major First Amendment risks" inherent in waiting: "self censorship by speakers in order to avoid being denied a license to speak; and the difficulty in effectively detecting, reviewing and correcting content-based censorship 'as applied' without standards by which to measure the licensor's action." *See City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. at 759, 108 S.Ct. 2138. The Supreme Court made clear that a facial challenge claim may be raised only where the challenged law or regulation has a close nexus to expressive activities. *See id.* at 759, 108 S.Ct. 2138. Here, plaintiffs ask the Court to expand the scope of recognized facial challenge claims based on prior restraint of speech in the domestic licensing context to entertain a challenge to a statutory scheme that allegedly infringes on free press rights of access to battlefields in time of combat. *See* Pls.'

Mem. at 43. This is not an uncontroversial extension of the facial challenge doctrine.

Second, if the Court ultimately were persuaded by plaintiffs to extend the law of the First Amendment prior restraint licensing doctrine to permit facial challenges to include press access protections, the Court necessarily would have to determine whether there is in fact a First Amendment right of access to the battlefield. As it noted in *Flynt I*, the Court agrees that there may be a limited or qualified right of media access to the battlefield. *See Flynt v. Rumsfeld*, 180 F.Supp.2d at 175–76; *see also Nation Magazine v. Dep't of Defense*, 762 F.Supp. at 1572. The Court is hesitant, however, to announce such a significant principle of First Amendment protection in the context of a new application of the facial challenge mechanism, unmoored to a case or controversy in the traditional sense. *See Flynt v. Rumsfeld*, 180 F.Supp.2d at 176 ("The specific parameters of this First Amendment 'qualified right of access' . . . would depend upon the particular circumstances presented."). The Supreme Court's direction to consider declaratory relief through the lense of "wise judicial administration" cautions against taking such a bold step in the current posture of this case. *See Wilton v. Seven Falls Co.*, 515 U.S. at 288, 115 S.Ct. 2137.

Once again, Judge Sand's analysis in *Nation Magazine* is instructive. In that action certain claims had become moot by the time Judge Sand issued his decision, and only facial challenges claims remained "eligible" for declaratory relief. *See Nation Magazine v. Department of Defense*, 762 F.Supp. at 1570 n. 11.[8] Although Judge Sand opined that there was a limited right

---

**8.** The Court notes that Judge Sand did not discuss his implicit extension of the facial challenge doctrine based on prior restraint cases to the different context of press access claims.

of media access to the battlefield, he nevertheless concluded that it was inadvisable to decide the merits of the claim in the context of a declaratory judgment action raising only facial challenges:

> In order to decide this case on the merits, it would be necessary to define the outer constitutional boundaries of access. Pursuant to long-settled policy in the disposition of constitutional questions, courts should refrain from deciding issues presented in a highly abstract form, especially in instances where the Supreme Court has not articulated guiding standards. [...] Since the principles at stake are important and require a delicate balancing, prudence dictates that we leave the definition of the exact parameters of press access to military operations abroad for a later date when a full record is available, in the unfortunate event that there is another military operation. Accordingly, the Court declines to exercise its power to grant plaintiffs' request for declaratory relief on their right of access claim.

*Nation Magazine v. Department of Defense*, 762 F.Supp. at 1572 (citing *Rescue Army v. Municipal Court of Los Angeles*, 331 U.S. 549, 575–585, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947)). *See also Texas v. United States*, 523 U.S. 296, 301, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) ("[t]he operation of the statute is better grasped when viewed in light of a particular application. Here, as is often true, '[d]etermination of the scope ... of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function.'") (internal citation omitted).

Judge Bates recently expressed a similar caution against premature declaration of rights in the context of military decisions concerning press access to the battlefield. In *Getty Images News Services, Corp. v. Department of Defense*, 193 F.Supp.2d 112, 113 (D.D.C.2002), the plaintiff, a reputable press organization, raised First Amendment and equal protection challenges to its alleged exclusion by the Department of Defense from the National Media Pool and regional media pools created by the Defense Department in Afghanistan covering Operation Enduring Freedom. After finding that plaintiff lacked standing to raise its claims because the Defense Department admitted the plaintiff to the National Media Pool after suit was filed and because the regional pools in Afghanistan had been discontinued, *see id.* at 116–17, Judge Bates concluded that plaintiff's request for a declaratory judgment that the Defense Department had violated its constitutional rights did not save plaintiff's claim. In the absence of an existing or anticipated regional pool, plaintiff's claim "was no longer part of a controversy of sufficient immediacy and reality to warrant declaratory relief." *Id.* at 117, n. 7 (internal quotations and citations omitted). Judge Bates also concluded that to the extent that plaintiff sought an injunction with respect to "regional pools outside of Afghanistan that may be established in the future," or "future military restrictions in which DOD may restrict access without establishing a pool," the claim was "entirely too speculative to provide a basis for relief under both standing and ripeness analyses." *See id.* at 117. He emphasized that "the absence of a concrete controversy is of particular concern in light of the important constitutional issues at stake and the national defense interests that might be implicated." *See id.* at 118.[9]

---

**9.** The court of appeals has expressed similar hesitation in the context of a constitutional

claim of first impression in the First Amendment context. *See Penthouse International,*

For these reasons, the Court concludes that the more prudent course is to delay resolution of these constitutional issues until and unless plaintiffs are denied access after having pursued their request through normal military channels. *But see* note 3, *supra.* The Court therefore declines to exercise its discretion to consider the declaratory relief plaintiffs seek in connection with their facial challenge claims.

### 4. Injunctive Relief

 In the Amended Complaint, plaintiffs request "an order pursuant to Fed. R. Civ. Proc. 65 restraining Defendants from utilizing the current Department of Defense guidelines in determining Plaintiffs' application for press access to the battlefields of Operation Enduring Freedom, including overt combat operations." *See* Amended Complaint at 29–30, ¶ H. For prudential reasons similar to those discussed above, the Court declines plaintiffs' request for a permanent injunction. For the reasons well expressed by Judge Bates, prudence dictates that the Court refrain from exercising its power to grant injunctive relief as much as it does with respect to declaratory relief until a genuine case or controversy is presented "of sufficient immediacy and reality." *Getty Images News Services Corp. v. Department of Defense,* 193 F.Supp.2d at 117 n. 7.

### III. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss plaintiffs' amended complaint is granted. An Order consistent with this Opinion shall issue this same day.

SO ORDERED.

*Ltd. v. Meese,* 939 F.2d 1011, 1020 (D.C.Cir. 1991) (a court should refrain from exercising its equitable powers under the Declaratory Judgment Act "where the court can avoid the

*ORDER AND JUDGMENT*

This came before the Court on defendants' motion to dismiss or, in the alternative, for summary judgment. For the reasons stated in the Opinion issued this same day, it is hereby

ORDERED that defendants' motion to dismiss [20–1] is GRANTED; it is

FURTHER ORDERED that JUDGMENT is entered for defendants; it is

FURTHER ORDERED that this case is DISMISSED from the docket of this Court; and it is

FURTHER ORDERED that this Order and Judgment shall constitute a FINAL JUDGMENT in this case. This is a final appealable order. *See* Rule 4(a), Fed. R.App. P. .

SO ORDERED.

premature adjudication of constitutional issues"; a court should instead "wait to decide the issue until it is squarely presented.").