**JB PICTURES, INC., et al., Appellants,**

**v.**

**DEPARTMENT OF DEFENSE and Donald B. Rice, Secretary of the Air Force, Appellees.**

No. 93–5194.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 26, 1996.

Decided June 18, 1996.

As Amended June 18, 1996.

Louis M. Bograd, Washington, DC, argued the cause and filed the briefs, for appellants.

Mark B. Stern, Attorney, Department of Justice, argued the cause, for appellees. With him on the brief were Frank W. Hunger, Assistant Attorney General, and Eric H. Holder, Jr., United States Attorney, Washington, DC.

Before: WALD, WILLIAMS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Dover Air Force Base is the site of the only mortuary operated jointly by the military services on the East Coast. For a substantial period before Operation Desert Storm, soldiers killed abroad (for instance, in Lebanon in 1983 and Panama in 1989) returned to the U.S. through Dover. These returns were events open to the public and press and were accompanied by ceremonies honoring the dead. Shortly before the start of Operation Desert Storm, the Department of Defense instituted a new policy, effectively shifting these events to sites closer to the families of the deceased and providing that the families would exercise veto power over press coverage. The Department explained that it was doing so to reduce the hardship on those of the bereaved who otherwise might have felt obliged to travel to Dover for the arrival ceremonies:

> Therefore, it is the military departments' policy that ceremonies/services be held at the service member's duty or home station and/or the interment site, rather than at the port of entry. Media coverage of the arrival of the remains at the port of entry or at interim stops will not be permitted, but may be permitted at the service member's duty or home station or at the interment site, if the family so desires.

Public Affairs Guidance—Operation Desert Storm Casualty and Mortuary Affairs ¶ 3 (Feb. 7, 1991), Joint Appendix ("J.A.") 123. There was no change in the pre-existing policy allowing civilians to witness other activities on the base, including outgoing transport of military personnel and supplies to the Persian Gulf, as long as such access was consistent with any other applicable restrictions.

JB Pictures and several other media and veterans' organizations and individual reporters challenged the Dover access policy on First Amendment grounds, arguing that precluding access to the war dead at Dover while permitting access to other activities—ones allegedly placing Desert Storm in a more positive light—constituted impermissible "viewpoint discrimination." The district court dismissed the complaint, finding no First Amendment violation. *JB Pictures, Inc. v. Dep't of Defense,* No. 91–0397, 1993 WL 166918 (D.D.C. Apr. 22, 1993). This appeal followed.

The government on appeal suggests that the end of Desert Storm mooted the case. Because this defense is jurisdictional, it may be raised at any time. *St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 537, 98 S.Ct. 2923, 2927, 57 L.Ed.2d 932 (1978); *City of New York v. Baker,* 878 F.2d 507, 510 (D.C.Cir.1989). But the government effectively concedes that the press and public continue to be excluded from viewing the return of the bodies of deceased soldiers at Dover Air Force Base.[1] The ongoing policy of exclusion thus still affects news organizations and other groups that wish to witness and report on the return of soldiers killed in conflicts in which the United States is presently involved. At least some of the plaintiffs here claim a general and ongoing interest in military affairs, and thus they easily fall within the affected class.

On the merits, the plaintiffs recognize, as they must, that First Amendment rights to "freedom of speech, [and] of the press" do not create any per se right of access to government property or activities simply because such access might lead to more thorough or better reporting. "[T]he prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right." *Zemel v. Rusk,* 381 U.S. 1, 17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). Thus the

---

1. Media coverage of the return of the caskets of former Commerce Secretary Ron Brown and other victims of the fatal crash of Brown's plane in Croatia earlier this spring indicates that the press was permitted access to Dover for this occasion. See, e.g., Meg Greenfield, "The Long Journey from Mass Graves to Stately Honor Guards," *Wash. Post,* Apr. 15, 1996, at A21.

Court has found in the First Amendment only a qualified right of access. For example, in *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), a case involving public and press access to prisons, the Court quoted and seemed to rely on a balancing test set forth in *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), which upheld grand juries' power to question reporters about confidential sources in part on the ground that the Court could

> perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial.

408 U.S. at 690–91, 92 S.Ct. at 2661–62 (quoted in full in *Pell,* 417 U.S. at 833, 94 S.Ct. at 2809). The Court has also held that in the case of proceedings that are traditionally open to the public and are enhanced by public access, such as criminal trials, the public and press have a constitutional right to access unless the denial of access is necessitated by an "overriding" governmental interest and is narrowly tailored to serve that interest. *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 510, 104 S.Ct. 819, 824, 78 L.Ed.2d 629 (1984); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 581, 100 S.Ct. 2814, 2829–30, 65 L.Ed.2d 973 (1980) (plurality opinion); see also *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 606–07, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248 (1982) (requiring a "compelling" interest).

In *Richmond Newspapers,* the first case finding a right of access to criminal trials, the plurality distinguished *Pell* on the ground that prisons, unlike criminal trials, did not have a "long tradition of openness" to the public. 448 U.S. at 577 n. 11, 100 S.Ct. at 2827 n. 11. The Third Circuit appears to take the view that without such a tradition, a claim to access cannot succeed regardless of the relative strengths of the plaintiff's and government's interests. See *Capital Cities*

*Media, Inc. v. Chester,* 797 F.2d 1164, 1173–76 (3d Cir.1986). We assume the approach more favorable to plaintiffs, the balancing test.

■ Recognizing that none of these precedents (which we apply shortly) affords them much probability of relief, plaintiffs focus their energies on arguing that the Dover access policy is "discriminatory" and "viewpoint-based." But the policy applies in a uniform fashion to all members of the press and public, regardless of their views on war or the United States military. It is thus altogether different from the decision struck down in *Sherrill v. Knight,* 569 F.2d 124 (D.C.Cir.1977), where the Secret Service had denied a journalist access to White House press facilities that were generally available to Washington reporters without any notice of the reasons for denial or opportunity to respond.

The plaintiffs contend, nevertheless, that the uniformity of the policy's application does not render it viewpoint-neutral, as "certain symbols and images carry their own implicit content." Reply Brief for the Appellants at 13. Thus, they say, visual images of caskets of deceased soldiers convey a certain message, and images of soldiers or military supplies being loaded onto an outgoing transport plane convey quite a different one. There is undoubtedly some truth in the observation, although we question plaintiffs' apparent view that the return of war dead is an event necessarily laden with anti-war implications. One has only to think of Pericles's famous speech honoring the first Athenians killed in the Peloponnesian War, or the Gettysburg Address, to recognize that one cannot easily pigeonhole the meaning of a return of soldiers killed in battle. Likewise, we are less confident than plaintiffs that images of soldiers *departing* for combat necessarily create a positive image of war in the public mind.

Even apart from questions about which viewpoints (if any) are served by the Dover access policy, the prison access restrictions at issue in *Pell* and its companion case, *Saxbe v. Washington Post Co.,* 417 U.S. 843, 846–50, 94 S.Ct. 2811, 2813–15, 41 L.Ed.2d 514 (1974), were upheld despite obvious potential for differential effects. The regulations sus-

tained there prevented reporters from *designating* individual prisoners for face-to-face interviews, except insofar as reporters might qualify under general rules allowing family, friends, attorneys and clergy to visit specific prisoners. The selectivity of the rule presumably had a differential effect on reporters seeking to discover protest and complaint as compared with ones more content to describe the prison as its authorities sought to have it presented. Yet the Court was apparently untroubled by this inevitable and obvious consequence.

Indeed, as the government notes, if plaintiffs' theory of "viewpoint discrimination" were accepted, virtually any restriction on access to government facilities—including the restrictions in *Saxbe* and *Pell*—would be vulnerable to challenge on grounds of "viewpoint discrimination." Such a move would represent a complete transformation of the law's permissive treatment of restrictions on access to government operations not historically open to the public. See *Saxbe; Pell;* see also *Houchins v. KQED, Inc.,* 438 U.S. 1, 12–16, 98 S.Ct. 2588, 2595–98, 57 L.Ed.2d 553 (1978) (plurality opinion) (arguing that legislatures, not courts, should determine the degree to which prisons should be opened to the press). It is a commonplace, for example, that holders of high political office showcase their roles in popular initiatives with signing ceremonies, announcements and news conferences, often with carefully selected backdrops, while performing acts less likely to be acclaimed in venues from which the public and press are excluded. Acceptance of plaintiffs' theory would have the courts grant tickets to all these events, absent a special government justification for each differential in access.

We also reject plaintiffs' effort to coax some discrimination out of the fact that the Dover access policy was adopted in contemplation of Desert Storm and represented a departure from the policy during the Panama invasion and other events in the 1980s. Surely the government is not subject to a one-way ratchet, in which any new restriction on access is automatically invalid, or even especially suspect, while any relaxation of limits becomes a new constitutional minimum

(or at least a trigger of special scrutiny). Cf. *Pell,* 417 U.S. at 831, 94 S.Ct. at 2808 (noting that California's decision not to allow members of the press to interview prisoners designated by them reversed a former policy and brought its treatment of the press (on this point) into alignment with its treatment of the public as a whole).

We return, then, to plaintiffs' general claim of a right of access to Dover. It is obvious that military bases do not share the tradition of openness on which the Court relied in striking down restrictions on access to criminal court proceedings in *Press–Enterprise, Richmond Newspapers,* and *Globe Newspaper.* And plaintiffs fare no better under the balancing test set forth in *Branzburg* and *Pell.* The burden on their news gathering activity imposed by the Dover access policy is relatively modest. Plaintiffs do not allege that greater access to Dover will reveal new information about the occurrence or magnitude of casualties in military conflict. Thus, unlike the restrictions upheld in *Saxbe* and *Pell,* the Dover policy does not impede acquisition of basic facts, the raw material of a story.

Further, as noted above, the Dover policy allows public and press access to interment ceremonies if the relevant family members consent, and also to any arrival ceremonies held at the soldiers' home bases, again with the family's consent. See Public Affairs Guidance—Operation Desert Storm Casualty and Mortuary Affairs ¶ 3, J.A. 123. This may not be a perfect substitute for general access to Dover, of course; among other things, access depends on the decision of the bereaved. But it surely lessens the bite of the restriction at Dover, much as the breadth of the opportunity for press-prisoner contact in *Saxbe* and *Pell* led the Court to conclude that the press enjoyed "substantial," though not complete, access to inmates. *Saxbe,* 417 U.S. at 846, 94 S.Ct. at 2813; *Pell,* 417 U.S. at 833, 94 S.Ct. at 2810.

The government points to a number of interests in support of the Dover policy, of which we think two amply suffice. First, as the government stated in announcing the policy, the limitation on access is intended to reduce the hardship on the families and

friends of the war dead, who "may feel obligated to travel great distances" to attend arrival ceremonies at Dover if such ceremonies are held. Public Affairs Guidance—Operation Desert Storm Casualty and Mortuary Affairs ¶ 3, J.A. 123. Plaintiffs respond that families and friends would not feel obliged to come if arrival ceremonies were not held and that the government can therefore avoid the problem by simply not holding arrival ceremonies. We are unsure whether the family and friends of a deceased soldier would cease to feel any obligation to be present at a *public* transit through Dover just because it was not to be accompanied by an "arrival ceremony." In any event, we do not see how the Constitution can be said to put the government to such a choice—public arrival at Dover without a ceremony (exposing the government to a probably justifiable charge of callous indifference) or public arrival with a ceremony (actually inflicting burdens on the bereaved, and thus exposing it to a charge of callousness).

The government also asserts an interest in protecting the privacy of families and friends of the dead, who may not want media coverage of the unloading of caskets at Dover. The strength of the interest will of course vary with the pattern of use of Dover: the smaller the number arriving at any given time, and the smaller the number of occasions of arrival, the easier it is for outsiders to infer the identity of an individual soldier. In any event we do not think the government hypersensitive in thinking that the bereaved may be upset at public display of the caskets of their loved ones. We note that the government's policy of allowing the family the right to deny access to services at the home base is consistent with its assertion of this interest behind the policy at Dover. Accordingly, we have no hesitation in concluding that there was nothing impermissible about the access restrictions imposed at Dover Air Force Base.

Apart from their access claim, plaintiffs invoke a theory that their exclusion from Dover when war dead are present unconstitutionally denies them a right to the opportunity to *speak* in that setting. The district court found that the plaintiffs' allegations did

not embrace a claim based on the right to engage in speech on the base. *JB Pictures,* Mem. op. at 6 n.6. We agree.

■ To support the view that their complaint raised such a claim, plaintiffs point to a single allegation—that members of plaintiff Veterans for Peace ("VFP") intended to "witness and pay their respects to the war dead as they arrive[d] in the United States." Complaint ¶ 7. In some contexts, of course—e.g., "bear witness"—the word "witness" connotes expressive activity, indeed, commonly speech. But in the context used here, the "witness" component of this isolated phrase suggests mere seeing, i.e., an aspect of the overall access claim. The paragraph in which the phrase appears further undermines the idea that it asserts a right to speak at Dover. The two preceding sentences introduce and describe the functions of the VFP organization in the following terms:

[VFP] is a non-profit *educational* organization of over 2,600 veterans of U.S. wars with 53 chapters that is *dedicated to abolishing war as an instrument of international policy.* VFP provides *public information about the costs of war,* establishes relations with peace-seeking veterans of other nations, and participates in international fact-finding and monitoring missions.

*Id.* (emphasis added). Thus, VFP is an organization primarily concerned with carrying a message *from* Dover. In context, then, the isolated allegation of a desire to witness and pay tribute to the war dead does not discernibly constitute a claim to a right to speak on the base.

The other plaintiffs before us echo VFP in describing themselves in the complaint entirely in terms of their interests in such matters as reporting news and educating the American people, i.e., in carrying messages from Dover to a broad national (or international) audience. We see no error in the district court's failure to discern in their allegations something besides what they plainly focused on—the right to access for news gathering. Plaintiffs were, of course, free to seek the court's permission to amend their complaint (perhaps after filing a motion to set aside the court's judgment under Rule

**242**

59(e) or 60(b) of the Federal Rules of Civil Procedure, see *Vicom, Inc. v. Harbridge Merchant Services, Inc.,* 20 F.3d 771, 784–85 (7th Cir.1994)), but they chose not to avail themselves of that opportunity.

\* \* \*

Because the access policy at Dover does not violate the First Amendment's guarantees of freedom of speech and of the press, and because the complaint does not embrace a claim based on the right to engage in on-base speech, the judgment of the district court is

*Affirmed.*