Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 21, 2003  Decided February 3, 2004

No. 03-5075

LARRY FLYNT AND L.F.P., INC.,
APPELLANTS

v.

DONALD H. RUMSFELD,
IN HIS OFFICIAL CAPACITY AS SECRETARY OF DEFENSE AND
DEPARTMENT OF DEFENSE,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 01cv02399)

*Paul J. Cambria, Jr.* argued the cause for appellants. With him on the briefs were *Roger W. Wilcox, Jr.* and *John G. Perazich.*

*Michael S. Raab*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Peter D. Keisler*, Assistant Attorney General, *Roscoe C. Howard, Jr.*, U.S. Attorney, and *Mark B. Stern*, Attorney, U.S. Department of Justice.

Before: Edwards, Sentelle and Henderson, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* Sentelle.

Sentelle, *Circuit Judge*: Larry Flynt and L.F.P., Inc. (the company that publishes *Hustler* magazine) (collectively "Flynt" or "appellants") sued Donald H. Rumsfeld, Secretary of Defense, and the United States Department of Defense ("DOD") seeking, *inter alia*, injunctive relief against interference with its exercise of a claimed First Amendment right of the news media to have access to U.S. troops in combat operations, and claiming that DOD's delay in granting *Hustler*'s reporter access to U.S. troops in Afghanistan infringed that right. They further argued that DOD's Directive controlling media access to military forces facially violates this same constitutional right. The District Court dismissed Flynt's as-applied constitutional claims for lack of ripeness and standing, and refused to exercise its discretion under the Declaratory Judgment Act to declare the pertinent DOD Directive facially unconstitutional. This appeal followed. Because we find that no such constitutional right exists, we will affirm the District Court's decision on other grounds.

## I.   Background

### A.   *Hustler*'s attempts to gain access

Shortly after the September 11, 2001, terrorist attacks, the United States military began combat operations in Afghanistan in support of the global war on terrorism. On October 30, 2001, Flynt wrote a letter to the Honorable Victoria Clarke, Assistant Secretary of Defense for Public Affairs, requesting that *Hustler* correspondents "be permitted to accompany ground troops on combat missions and that said correspondents be allowed free access to the theater of United States military operations in Afghanistan and other countries where hostilities may be occurring as part of Opera-

tion Enduring Freedom." Two weeks later, on November 12, 2001, Flynt wrote Clarke again requesting the same access and complaining about her failure to respond to his October 30 letter. Three days later, on November 15, Clarke sent Flynt a fax stating that access to ground operations was not immediately possible because ". . . the only U.S. troops on the ground in Afghanistan are small numbers of servicemen involved in special operations activity." Clarke explained that "[t]he highly dangerous and unique nature of their work makes it very difficult to embed media" with ground troops, but also stated that there had been "extensive" media access to other aspects of military operations. Specifically, "[s]cores of reporters and photographers have covered the [air] strikes, witnessed the humanitarian drops and interviewed dozens of [soldiers]." Clarke then provided Flynt with contact information for the Fifth Fleet Public Affairs Officer so that *Hustler* could have similar access.

Not satisfied with the access provided by DOD, and that other media outlets had received, Flynt did not contact the Fifth Fleet Public Affairs Officer; rather, he filed this lawsuit the day after he received Clarke's fax. Shortly after filing suit, Flynt sent another letter to Clarke on January 15, 2002, stating that "I did not contact [the Fifth Fleet Public Affairs Officer] because I did not request any such access or similar access. Rather, I specifically requested reporter access to actual battlefield combat activities." The letter also characterized Clarke's description of special operations activities as vague. Two weeks later, Flynt sent another letter to Clarke requesting an immediate response to his January 15 letter. Clarke responded by letter on February 4, 2002, reiterated DOD's position, and again described the access that was currently available. Furthermore, she stated that "all [your reporter] needs to do is work with [DOD's] people on the ground." She also provided Flynt with an extensive list of contact persons and explained that DOD decisions regarding media access were controlled by Department of Defense Directive 5122.5.

On February 19, 2002, Flynt's lawyer sent an email to Lieutenant Commander Bonnie Hebert, one of the contacts

Clarke had provided, requesting "permission to have *Hustler* magazine correspondents accompany and report on the activities of American soldiers on the ground in Afghanistan who are engaged in combat actions." Hebert responded three days later, asking "[w]here exactly in Afghanistan would you like to go?" and requesting the identity of the reporter. This began a series of communications that ultimately resulted in David Buchbinder, a *Hustler* reporter, arriving at Bagram Air Force Base by May 7, 2002. Once in Afghanistan, Buchbinder placed himself on a list of reporters awaiting access to ground units. Since his arrival in Afghanistan, Buchbinder has filed several stories, at least one of which shows he has accompanied troops on a search for al Qaeda operatives.

## B. The Directive

As stated above, DOD decisions regarding media access to combat troops are guided by Department of Defense Directive 5122.5. This Directive, issued on September 27, 2000, assigns the responsibility of "[e]nsur[ing] a free flow of news and information to the news media" to the Assistant Secretary of Defense for Public Affairs. Directive 5122.5. The Directive contains three enclosures. At issue in this case is Enclosure 3, entitled "Statement of DOD Principles for News Media." This enclosure begins with the command that "[o]pen and independent reporting shall be the principal means of coverage of U.S. military operations." ¶ E3.1.1. It then outlines the manner in which such coverage should occur. It allows for media pools, limited numbers of press persons who represent a larger number of news media organizations and share material, but states that pools are not to be the "standard means of covering U.S. military operations." ¶ E3.1.2. Rather, pools are only to be used when space is limited or areas to be visited are extremely remote. ¶ E3.1.3. It also directs that "field commanders should be instructed to permit journalists to ride on military vehicles and aircraft when possible." ¶ E3.1.7. In sum, the Directive represents an attempt to facilitate broad media coverage, and contains few restrictions, including limited restrictions on media com-

munications for security purposes and expulsion for members of the media who violate the ground rules. *Id.* at ¶ ¶ E3.1.4. & E3.1.8. It also includes the caveat that "[s]pecial operations restrictions may limit access in some cases." ¶ E3.1.5.

## C. Proceedings Below

Flynt and L.F.P., Inc., filed their initial complaint against the DOD and Secretary Rumsfeld on November 16, 2001, requesting preliminary and permanent injunctive relief. In addition, Flynt challenged Directive 5122.5 on the grounds that (1) enforcement of the policies violated his historical and constitutional rights of access to the battlefield; (2) enforcement of the policies amounted to a content-based prior restraint that deprived him of his First Amendment rights; (3) DOD's denial of his request was not narrowly tailored to further a substantial government interest; and (4) DOD's denial was arbitrary and capricious and made without reference to specific and objective standards.

After a hearing on Flynt's motion for a preliminary injunction, the District Court denied the motion, stating that it was "persuaded that in an appropriate case there could be a substantial likelihood of demonstrating that under the First Amendment the press is guaranteed a right to gather and report news" about U.S. military operations, subject to reasonable regulations. *Flynt v. Rumsfeld*, 180 F. Supp. 2d 174, 175 (D.D.C. 2002). That being said, the District Court determined that Flynt's likelihood of success on the merits was "far from clear," *id.* at 176, and that because of the quickly evolving factual situation any judicial decisions would "have to await the development of a fuller record," *id.* at 177.

On January 17, 2002, nine days after the District Court denied his motion for a preliminary injunction, Flynt filed an amended complaint. The amended claim presented ten claims, including: (Claim 1) a request for a declaration that the First Amendment guarantees Flynt a right of access to the battlefield, subject to reasonable regulations for safety and security; (Claims 2–4) a claim that DOD Directive 5122.5 fails to recognize and protect Flynt's First Amendment right

of access to the battlefield and DOD's denial of his request violated these same rights; (Claim 5) an assertion that the Directive does not contain constitutionally required definite and objective standards for determining press access; (Claim 6) a claim that the Directive fails to place reasonable time limits on DOD's decision-making process; (Claim 7) a contention that the Directive does not provide for prompt administrative appeal; (Claims 8–9) a claim that the Directive imposes an unlawful content-based prior restraint on the media's constitutional right to battlefield access; and (Claim 10) a request for preliminary and permanent injunctive relief. By motion filed February 7, 2002, DOD moved to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) or, in the alternative, for summary judgment under Federal Rule of Civil Procedure 56(c).

In considering DOD's motion, the District Court grouped appellants' claims as follows: claims 1–3, 8–9, and portions of claims 4–7 that alleged DOD improperly applied Enclosure 3 to Flynt's request, were considered as "as-applied claims;" and claims 4–7 were considered as facial challenges to Enclosure 3. *Flynt v. Rumsfeld*, 245 F. Supp. 2d 94, 99–100, 103 (D.D.C. 2003). The District Court also considered Flynt's request for injunctive relief.

With regard to the as-applied claims, the District Court held they were unripe because the record did not reflect DOD ever made a final decision with respect to Flynt's request. *Id*. at 102. Furthermore, Flynt would suffer no concrete hardship by delaying review. *Id*. at 103. Also citing the absence of a final decision, the District Court held Flynt had not suffered a concrete injury-in-fact and, thus, had no standing to press the as-applied claims. *Id*.

Turning to the facial challenges, the District Court held that Flynt had both constitutional and prudential standing. *Id*. at 104. The Court stated that because the DOD had already crystallized its policies in Enclosure 3, the "posture of these particular claims ma[de] it inappropriate to dismiss on prudential ripeness grounds." *Id*. at 105. The District Court also held that dismissal on political question grounds was

inappropriate because Flynt's claims did not "implicate the President's activities as Commander in Chief or the authority of the Secretary of Defense to direct military actions," nor did they require a court to apply principles beyond normal judicial competence. *Id.* at 107. The District Court did, however, refuse to exercise its discretion under the Declaratory Judgment Act to consider Flynt's facial claims. *Id.* Citing the considerable discretion the Declaratory Judgment Act gives to district courts, the court relied on the absence of a concrete controversy and the uncertainty surrounding Flynt's constitutional claims in withholding declaratory relief. *Id.* at 109–10. The court further refused to grant injunctive relief. *Id.* This appeal followed.

## II.  Analysis

This court reviews *de novo* the District Court's dismissal of a complaint for lack of subject matter jurisdiction. *Empagran S.A. v. F. Hoffman–LaRoche, LTD.*, 315 F.3d 338, 343 (D.C. Cir. 2003). In our review, we assume the truth of the allegations made and construe them favorably to the pleader. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). We review the District Court's decision to withhold declaratory relief for an abuse of discretion. *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995).

### A.  Appellants' Claims

As a threshold matter, it is important to clarify the right appellants seek to protect. In candor, it is not at all clear from appellants' complaint below or briefs in this court precisely what right they believe was violated or contend the courts should vindicate. After some pressing, at oral argument it became clear that they claimed a right, protected under the First Amendment, in their own words, to "go[ ] in [to battle] with the military." This right is different from merely a right to cover war. The Government has no rule–at least so far as Flynt has made known to us–that prohibits the media from generally covering war. Although it would be dangerous, a media outlet could presumably purchase a vehi-

cle, equip it with the necessary technical equipment, take it to a region in conflict, and cover events there. Such action would not violate Enclosure 3 or any other identified DOD rule.

With that distinction made, appellants' claim comes more sharply into focus. They claim that the Constitution guarantees to the media–specifically *Hustler*'s correspondent–the right to travel *with* military units into combat, with all of the accommodations and protections that entails–essentially what is currently known as "embedding." Indeed, at oral argument appellants' counsel stated that the military is "obligated to *accommodate* the press because the press is what informs the electorate as to what our government is doing in war."

### B. Ripeness and Standing

We first consider appellees' contention that appellants lack standing to assert their "as applied" claims and that those claims were not ripe. For the reasons set forth below, we conclude that appellants do have standing and that the claims are ripe.

Standing requires that plaintiffs allege "an injury in fact" that is "concrete and particularized and actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal punctuation omitted). In applying that test, we assume the validity of appellants' allegation of injury, although having crossed that threshold, we may ultimately determine it to be invalid. With that assumption, we hold that appellants do have standing to assert their as-applied claims. They asked for immediate access to accompany U.S. troops in combat, which they contend is their constitutional right, and that access was not granted. Therefore, appellants "ha[ve] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180 (2000). They have standing to challenge the Directive as it was applied in this case.

In order to test the ripeness and justiciability of the claims, we again assume that they are otherwise valid. Ripeness analysis tests whether a question has sufficiently matured to be amenable to adjudication. The Supreme Court has explained that when considering whether an issue is ripe for judicial review, a court must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties" of refusing a decision. *Texas v. United States*, 523 U.S. 296, 301 (1998) (internal quotation marks and citation omitted). Further, a claim is unripe if it depends on "contingent future events." *Id*. at 300.

Appellants' claim is that credentialed press persons have an immediate right, upon request, to accompany U.S. troops in combat. So understood, the as-applied claims are ripe. Flynt requested that *Hustler* reporters gain access to combat operations, and that access was not immediately granted. Instead, access of another sort was provided–that of covering "the [air] strikes, witness[ing] the humanitarian drops and interview[ing]" soldiers. Flynt's claim does not depend on "contingent future events." He asked for immediate access, which he contends is his constitutional right, and that access was not granted. On these facts, the question is presented in a concrete factual setting and is fit for judicial review.

## C.   Facial Challenge

With all of appellants' claims properly before us, we now turn to their validity. Because it is clear to us that appellants have asserted no cognizable First Amendment claim, both the as-applied and facial challenges fail.

The facial challenge is premised on the assertion that there is a First Amendment right for legitimate press representatives to travel with the military, and to be accommodated and otherwise facilitated by the military in their reporting efforts during combat, subject only to reasonable security and safety restrictions. There is nothing we have found in the Constitution, American history, or our case law to support this claim.

To support the position that there is such a constitutional right, appellants first point to cases that discuss the general

purposes underlying the First Amendment. *See New York Times Co. v. United States*, 403 U.S. 713, 717 (1971) ("[t]he press was protected so that it could bare the secrets of government and inform the people.") (Black, J., concurring); *Mills v. Alabama*, 384 U.S. 214, 218 (1966) (the First Amendment supports the "free discussion of governmental affairs."). These cases, however, say nothing about media access to the U.S. combat units engaged in battle.

Appellants also cite cases that allow facial challenges to statutes or regulations that vest public officials with unfettered discretion to grant or deny licenses to engage in expressive activity, such as *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 757 (1988), and *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969). This is not, however, a "license" decision. This appeal challenges regulations controlling *access* to government information and activity, not governmental limitation of expression. The Supreme Court has noted the difference. *See, e.g., Los Angeles Police Dept. v. United Reporting Publ'g Co.*, 528 U.S. 32, 40 (1999) (distinguishing government limits on access to information in its possession from a government restriction on disseminating information one already possesses).

Likewise, this Court has held that "freedom of speech [and] of the press do not create any per se right of access to government . . . activities simply because such access might lead to more thorough or better reporting." *JB Pictures, Inc. v. Dep't of Defense*, 86 F.3d 236, 238 (D.C. Cir. 1996). Appellants admit they face a "dearth of case law concerning press access to battles." From this unenviable position, they ask us to look to *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), for guidance.

In *Richmond Newspapers*, a plurality of the Supreme Court held that a constitutional right of public access to criminal trials existed based on a long history of such access in the United States and in England at the time our organic laws were created. *Id.* at 581. According to appellants, *Richmond Newspapers* established that the First Amendment may be interpreted to provide for a right of access to

government operations, and that access is not limited to criminal trials. They assert that we must apply a *Richmond Newspapers* analysis to the facts of this case. We disagree.

In *Center for National Security Studies v. Department of Justice*, 331 F.3d 918 (D.C. Cir. 2003), *cert. denied*, 2004 WL 46645 (Jan. 12, 2004), we held that there was no First Amendment right for plaintiffs to receive the identities of INS detainees and material witnesses who were detained in the wake of the September 11 attacks. Indeed, we made it clear that "[n]either the Supreme Court nor this Court has applied the *Richmond Newspapers* test outside the context of criminal judicial proceedings or the transcripts of such proceedings." *Id.* at 934. For emphasis, we added that "neither this Court nor the Supreme Court has ever *indicated* that it would" do so. *Id* (emphasis in original). Instead, we noted that in all areas other than criminal proceedings, the Supreme Court has applied the general rule of *Houchins v. KQED*, 438 U.S. 1 (1978) (plurality opinion), not the exception of *Richmond Newspapers*. *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 935. *Houchins* held that the press have no First Amendment right of access to prisons, and in doing so stated that the First Amendment does not "mandate[ ] a right of access to government information or sources of information within the government's control." *Houchins*, 438 U.S. at 15. To summarize, neither this Court nor the Supreme Court has ever applied *Richmond Newspapers* outside the context of criminal proceedings, and we will not do so today.

Appellants argue that we did, however, use the *analysis* underlying the *Richmond Newspaper* decision in *JB Pictures Inc. v. Department of Defense*, 86 F.3d 236, 240 (D.C. Cir. 1996). In that case, several media and veterans organizations challenged a Department of Defense policy. That policy shifted ceremonies for deceased service members arriving from overseas from Dover Air Force base to locations closer to the service members' homes. It also gave the families of deceased military personnel the authority to limit press access to those ceremonies. Contrary to appellants' assertion, the extent of our *Richmond Newspapers* discussion in that case is contained in one sentence: "[i]t is obvious that mili-

tary bases do not share the tradition of openness on which the Court relied in striking down restrictions on access to criminal court proceedings in ... *Richmond Newspapers*." *Id.* Thus *J.B. Pictures* not only does not support wholesale adoption of a *Richmond Newspapers* analysis in every case involving requests for access to government activities or information, it rejects such a rule.

Even if we were to apply a *Richmond Newspapers* test, which again, we do not, it would not support appellants' facial challenge to the Directive. As an initial matter, the history of press access to military units is not remotely as extensive as public access to criminal trials. Without going into great historic detail, it is sufficient that in *Richmond Newspapers* the Supreme Court relied on the "unbroken, uncontradicted history" of public access to criminal trials. *Id.* at 573. This includes the time when "our organic laws were adopted." *Id.* at 569. Indeed, even since "the ancient town meeting form of trial," the "people retained a 'right of visitation' which enabled them to satisfy themselves that justice was in fact being done." *Id.* at 572 (internal citations omitted).

No comparable history exists to support a right of media access to U.S. military units in combat. The very article cited by appellants for the proposition that media have traditionally had broad access to soldiers in combat does not support this position. *See* John E. Smith, *From the Front Lines to the Front Page: Media Access to War in the Persian Gulf and Beyond*, 26 Colum. J.L. & Soc. Probs. 291, 292–305 (1993). Beginning with the American Revolution, war reporting was primarily in the form of private letters from soldiers and official reports that were sent home and published in newspapers. *Id.* at 293. Indeed, the rise of the professional war correspondent did not begin until at least the time of the Civil War. *Id.* In addition, it is not entirely clear that in any of our early wars the media was actively embedded into units, which is the right appellants seek. In sum, even if we were to attempt a *Richmond Newspapers* analysis and consider the historical foundations of a right of media access to combat units, appellants' claim would fail miserably.

Even if *Richmond Newspapers* applied in this context, and even if there was a historical basis for media access to troops in combat, the Directive would still not violate the First Amendment. *Richmond Newspapers* expressly stated that "[j]ust as a government may impose reasonable time, place, and manner restrictions" in granting access to public streets, "so may a trial judge . . . impose reasonable limitations on access to a trial." 448 U.S. at 581 n.18. These limitations could be based on the need to maintain a "quiet and orderly setting," or "courtrooms' . . . limited capacity." *Id.* The Directive appellants challenge is incredibly supportive of media access to the military with only a few limitations. The Directive begins with the command that "[o]pen and independent reporting shall be the principal means of coverage of U.S. military operations." DOD Directive 5122.5 ¶ E3.1.1. It further orders military public affairs officers to "act as liaisons, but [ ] not [to] interfere with the reporting process." *Id.* at ¶ E3.1.6. Additionally, "field commanders should be instructed to permit journalists to ride on military vehicles and aircraft when possible." *Id.* at ¶ E3.1.7. The restrictions contained in the Directive are few, including: special operations restrictions; limited restrictions on media communications owing to electromagnetic operational security concerns; use of media pools when the sheer size of interested media is unworkable, such as at the beginning of an operation; and expulsion for members of the media who violate the ground rules. *Id.* at ¶ ¶ E3.1.2.-E3.1.8. Appellants have offered no reason to conclude that these restrictions are unreasonable. Even if *Richmond Newspapers* did apply, appellants' argument would fail.

The District Court, therefore, was more than correct when it stated that declaring the Directive unconstitutional would entail announcing an uncertain, yet "significant principle of First Amendment protection in the context of a new application of the facial challenge mechanism." *Flynt v. Rumsfeld*, 245 F.Supp. 2d at 108. In no way did the District Court abuse its discretion in refusing to grant declaratory relief.

### D. As-applied Challenges

We now turn to the as-applied challenges. As explained above, the constitutional right appellants assert does not exist, so the as-applied claim could only survive if this otherwise constitutional Directive was applied to them in some unconstitutional way. It was not. At no time has Flynt ever claimed that he, or *Hustler*, was treated differently under the Directive than any other media outlet. Nor has he claimed that the Directive is some sort of a sham that was not followed.

Even if there were some underlying constitutional right of media access to U.S. troops in battle, the Directive, and its application to appellants in this case, certainly would not have violated it. When Flynt made his request, Clarke explained that "the highly dangerous and unique nature of [special operations] work makes it very difficult to embed media" with ground troops, but also said that there had been "extensive" media access to other aspects of military operations. Specifically, "[s]cores of reporters and photographers have covered the [air] strikes, witnessed humanitarian drops and interviewed dozens of [soldiers]." Clarke then provided Flynt with contact information for the Fifth Fleet Public Affairs Officer so that *Hustler* could have similar access. The explanation was clear and consistent with the Directive, which states that "[s]pecial operations restrictions may limit access in some cases." Directive 5122.5 ¶ E3.1.5. Indeed, in conformity with the letter and spirit of the Directive, Clarke not only explained why direct access to ground troops was not currently possible, but she also immediately gave Flynt the information necessary to receive the access that was available. It was Flynt who failed initially to contact the designated public affairs officer. Ultimately, Flynt's reporter was given broad access to troops and has filed several stories, at least one of which shows he has accompanied troops on a search for al Qaeda operatives.

At oral argument, appellants asserted that DOD waited too long in making a final decision, and that they should have been required to promptly tell him that "this is a special

forces operation, and you can't go." According to appellants, if this were the case, "at least there would be an answer and [we would have been] denied." This is, of course, precisely what happened. Within 16 days of Flynt's initial request, DOD responded by informing him that only special operations were underway. They also, however, advised him that access would be expanding in the future and that substantial access was already available. They provided him with the necessary contact information to ensure that his *Hustler* reporter would be there with other media representatives. All of this occurred within 90 days of the September 11 attacks. In sum, there is nothing in the record that shows the otherwise constitutional Directive was applied to appellants in any illegal manner.

### III. Conclusion

Because we hold that there is no constitutionally based right for the media to embed with U.S. military forces in combat, and because we further hold that the Directive was not applied to Flynt or *Hustler* magazine in any unconstitutional manner, the District Court's judgment is affirmed.