# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

--------

Argued November 23, 2004          Decided January 21, 2005
                                          Reissued February 16, 2005

No. 02-5227

THE CENTER FOR LAW AND EDUCATION, ET AL.,
APPELLANTS

v.

DEPARTMENT OF EDUCATION,
APPELLEE

--------

Consolidated with
04-5150

--------

Appeals from the United States District Court
for the District of Columbia
(No. 02cv00443)
(No. 02cv02414)

--------

*Stephanie E. Sawyer* argued the cause for appellants. With her on the briefs were *David B. Bergman* and *Ida L. Bostian*.

*Catherine Y. Hancock*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Peter D. Keisler*, Assistant Attorney General, *Kenneth L. Wainstein*, U.S. Attorney, and *Mark B. Stern*, Attorney.

Before: EDWARDS, SENTELLE and RANDOLPH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

Opinion concurring in the judgment in part filed by *Circuit Judge* EDWARDS.

SENTELLE, *Circuit Judge*: Appellants appeal from judgments of the District Court dismissing their claims on the grounds that (1) plaintiffs lacked standing to challenge the membership of a rulemaking committee convened pursuant to the No Child Left Behind Act, and (2) the Act barred judicial review of the committee's membership. Appellants contend that they have standing to pursue their challenges, and that the Act does not bar judicial review of the Secretary of Education's choice of committee members. Because we agree with the District Court's holding that Appellants lack standing to pursue their claims, we affirm the judgments of the court. Moreover, because this Court concludes that it lacks Article III jurisdiction over this case, it does not consider the alternate issue of whether judicial review is barred by the Act.

## I. Background

### A. *The No Child Left Behind Act*

On January 8, 2002, the President signed into law the "No Child Left Behind Act" ("NCLBA" or "the Act"). Pub. L. No. 107-110, 115 Stat. 1425, *codified at* 20 U.S.C. § 6301 *et seq.* The Act requires each State to implement statewide accountability systems for all public schools and their students, to define education standards, and to establish a system of assessments for measuring whether students have met those standards. 20 U.S.C. § 6311. Under the Act, a school's

continued failure to make adequate yearly progress toward meeting proficiency goals will give rise to assistance and intervention, with parents of students in failing schools allowed to transfer their children to better schools. *Id*. at § 6316(b).

The Act authorizes the Department of Education ("DOE") to adopt regulations for the oversight of States' design of standards and assessments. 20 U.S.C. § 6571. In order to "ensure that final regulations are issued by the Secretary not later than" January 8, 2003, *id*. at § 6571(b)(4)(A), Congress directed the Secretary to utilize a "negotiated rulemaking process." *Id*. at § 6571(b)(3)(A).

The framework for promulgating and adopting regulations under the Act is laid out with specificity. First, the Secretary of Education is to "obtain the advice and recommendations" of various interest groups. *Id*. at § 6571(b)(1). Second, the Secretary shall "establish a negotiated rulemaking process" for the purpose of drafting regulations, *id*. at § 6571(b)(3)(A), and select individuals to participate in such process "from among individuals or groups that provided advice and recommendations . . . in such numbers as will provide an equitable balance between representatives of parents and students and representatives of educators and education officials . . . ." *Id*. at § 6571(b)(3)(B). Finally, "[s]uch process" shall be conducted before January 8, 2003. *Id.* at § 6571(b)(4)(A). The Secretary provides draft regulations to committee members prior to their first meeting. *Id*. at § 6571(b)(3)(C). The process "shall not be subject to the Federal Advisory Committee Act, but shall otherwise follow the provisions of the Negotiated Rulemaking Act of 1990 (5 U.S.C. 561 et seq.)." *Id*. at § 6571(b)(4).

This incorporation of the Negotiated Rulemaking Act ("NRA") implicates jurisdictional concerns, as the NRA bars judicial review of "[a]ny agency action relating to establishing,

assisting, or terminating a negotiated rulemaking committee under this subchapter," unless such review is otherwise provided by statute. 5 U.S.C. § 570. Section 6571(b)(4) does not explicitly describe selection of committee members as being included in the "process" subject to the provisions of the NRA, but it does not explicitly exclude member selection from the "process" subject to the NRA.

B. *Implementation of the Act's Framework; Contemporaneous Lawsuits*

On January 18, 2002, DOE published a request for advice and recommendations in the Federal Register. 67 Fed. Reg. 2770. On February 12, 2002, DOE issued an invitation for the submission of possible participants in the negotiated rulemaking. *See* Email from Susan B. Neuman, Ed.D., Assistant Secretary of Elementary and Secondary Education (Feb. 12, 2002), *reprinted in* Joint Appendix at 380-81. While the notice did stress that "[t]he nominees should be practitioners . . . [i.e.], they should be significantly involved with implementing and operating Title I programs," *id.*, it also noted that the negotiated rulemaking was to include "representatives of Federal, State and local administrators; parents; teachers and paraprofessionals; members of local school boards; and other organizations . . . ." *Id*.

The committee convened by the Secretary consisted of 24 members. According to the DOE, this body consisted of six representatives of "State Administrators and State Boards of Education," four representatives of "Local Administrators and Local School Boards," four representatives of "Principals and Teachers," seven representatives of "Students" (including one teacher, a few administrators, and a representative of a Diocese), one representative of "Business Interests," and two representatives of the DOE. 67 Fed. Reg. 9223, 9224 (Feb. 28,

2002), *corrected at* 67 Fed. Reg. 9935 (Mar. 5, 2002). The parties do not specify whether any of the non-"parent"/ "teacher" representatives are, themselves, parents or teachers. Appellants dispute the nominal makeup of this body. They claim that "only one" member represented "the interests of all public school parents and students," because some representatives actually stood in for "multiple perspectives." Brief for Appellants at 11.

The February 28 notice gave individuals and groups who "felt that his or her interests [we]re not adequately represented by this . . . group" the opportunity to petition at the March 11 meeting, in person, to be seated as a negotiator. 67 Fed. Reg. 9224. Plaintiff organization Designs For Change attempted to petition by phone to be seated (claiming that travel was economically infeasible). The DOE declined to hear the phoned-in petition. Decl. of Weckstein, Joint Appendix at 121. Appellants assert that Center for Law and Education also petitioned to be seated, Brief for Appellant at 13, although no such petition is apparent from the record. Likewise, it is not apparent that plaintiff Lindsey petitioned to be seated.

Appellants filed suit in District Court on March 8, 2002. They alleged that the committee did not achieve "an equitable balance between representatives of parents and students and representatives of educators and education officials," and sought a preliminary injunction. While the suit was pending, the committee convened, reviewed the Secretary's draft regulations, and reached consensus on every issue of academic standards and assessments before it. *See* 67 Fed. Reg. 30,452 (May 6, 2002). The Secretary received the committee's proposed rules, and published them for public notice and comment. *Id*. During the comment period, the DOE convened five regional meetings for further comment. *Id*.

In May 2002, the District Court held that it lacked jurisdiction over Appellants' challenge on two grounds. First, it held that the NRA § 570 judicial-review bar precluded judicial review of a challenge to the committee's composition prior to promulgation of final rules. *Ctr. for Law and Educ. v. U.S. Dep't of Educ.*, 209 F. Supp. 2d 102, 106-07 (D.D.C. 2002). The court noted the plaintiffs' argument that § 570 only applies to the "process" of committee deliberation, as 20 U.S.C. § 6571 provides that committee members would "participate in such process . . . ." 209 F. Supp. 2d. at 107. But the court ultimately rejected this interpretation of "process" because of "the implications of plaintiffs' theory." *Id.* Specifically, such interpretation would require DOE to segregate the NCLBA into "process" and "non-process" provisions, and apply the NRA accordingly; the Court saw such segregation and selective application to be implausible. *Id.* at 107-08. Moreover, to allow for lawsuits over selection of committee members would make compliance with the NCLBA's strict time limits infeasible. *Id.* at 108.

Second, the court held that review was unavailable under the Administrative Procedure Act ("APA"), because selection of the committee was not "final agency action." *Id*. at 111. Appellants filed an appeal, which later was stayed at Appellants' request.

In July 2002, the DOE published its final rules on state standards and assessments. 67 Fed. Reg. 45,038 (July 5, 2002) (to be codified at 34 C.F.R. pt. 200). The final rules took effect on August 5, 2002. *Id*.

In December 2002, Appellants filed a new complaint. They did not challenge the substance of the rules on traditional APA grounds. *See* 5 U.S.C. § 706. Instead, they again focused on the composition of the committee, calling for the rules to be set

aside and a new committee formed. On March 26, 2004, the District Court dismissed the suit for lack of jurisdiction, holding that Appellants lacked standing. *Ctr. for Law and Educ. v. U.S. Dep't of Educ.*, 315 F. Supp. 2d 15 (D.D.C. 2004). The court held that DFC and CLE ("the organizational plaintiffs") failed to demonstrate a procedural injury because the Act "contains no requirement that advocacy groups be represented on the negotiated rulemaking committee." *Id.* at 23. The court also rejected the organizations' standing on other grounds regarding lack of actual injury (i.e., the rules "do[] no more than arguably offend their policy goals," *id.* at 24) and lack of causation (i.e., the alleged injury was not caused by the formation of the committee, but rather, by subsequent choices made by State agencies. *Id.* at 25). As to the individual plaintiff, Rachelle Lindsey, the court held that because the Act created no enforceable right to have an equitably balanced committee, Lindsey suffered no actual injury. The "risk" that her children would not receive a high-quality education was too "hypothetical" and was dependant on the actions of the States, not the DOE. *Id.* at 26-29. Finally, the court also held that incorporation of the NRA included incorporation of its bar on judicial review of the establishment of the negotiated rulemaking committee. *Id.* at 29-33.

## II. Analysis

This Court reviews *de novo* a dismissal for lack of standing. *Nat'l Wrestling Coaches Ass'n v. U.S. Dep't of Educ.*, 366 F.3d 930, 937 (D.C. Cir. 2004). A dismissal for lack of subject matter jurisdiction is also reviewed *de novo. Flynt v. Rumsfeld*, 355 F.3d 697, 701 (D.C. Cir. 2004). In reviewing a ruling on a motion to dismiss, the court must accept as true all facts alleged by the nonmoving party and must draw all inferences in favor of the nonmoving party.

A. *The Judicial Review Bar*

As noted above, DOE raises two jurisdictional arguments: *first*, that Appellants lack Article III standing; and *second*, that Congress deprived this Court of jurisdiction to review the composition of the committee. *Supra* pages 3-4, 5-6. Because, as we discuss below, we hold that Appellants lack Article III standing, we do not consider the question, never before raised in this Court, of whether judicial review is barred in this matter. We "need not identify every ground for holding that a claim is not justiciable." *Fourth Branch Assocs. (Mechanicville) v. FERC*, 253 F.3d 741, 745 (D.C. Cir. 2001) (quoting *Indep. Petroleum Ass'n of America v. Babbitt*, 235 F.3d 588, 594 (D.C. Cir. 2001)). "[W]e have no trouble dismissing a claim 'based on one jurisdictional bar rather than another.'" *Id.* (quoting *Louisiana Envtl. Action Network v. Browner*, 87 F.3d 1379, 1384 (D.C. Cir. 1996)). *See also New Jersey Television Corp. v. FCC*, No. 03-1444, slip op. at 3 (D.C. Cir. Dec. 28, 2004). Any statements by this Court on the question of the judicial review bar would be "unnecessary dicta," which "precedent and prudence counsel us to avoid . . . ." *Louisiana Envtl. Action Network*, 87 F.3d at 1385.

B. *Standing*

This Court, like all Article III courts, is one of limited jurisdiction; we cannot decide cases that we lack constitutional authority to decide. *Wyoming Outdoor Council v. U.S. Forest Service*, 165 F.3d 43, 47 (D.C. Cir. 1999). We are empowered to hear only "cases or controversies." U.S. CONST. art. III, § 2. We ascertain whether or not the matter before us is a "case" or "controversy" by looking to whether, *inter alia*, the litigants have "standing." *Wyoming Outdoor Council*, 165 F.3d at 48. The "irreducible constitutional minimum of standing contains three elements": (1) the plaintiff must have suffered injury in

fact, an actual or imminent invasion of a legally protected, concrete and particularized interest; (2) there must be a causal connection between the alleged injury and the defendant's conduct at issue; and (3) it must be "likely," not "speculative," that the court can redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Where plaintiffs allege injury resulting from violation of a *procedural* right afforded to them by statute and designed to protect their threatened concrete interest, the courts relax–while not wholly eliminating–the issues of imminence and redressability, but not the issues of injury in fact or causation. *See Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664-65 (D.C. Cir. 1996) (*en banc*) (citing *Lujan*, 504 U.S. at 572-73 & nn. 8-9). Taken together, the plaintiffs have standing only if, *inter alia*, (1) the government violated their procedural rights designed to protect their threatened concrete interest, and (2) the violation resulted in injury to their concrete, particularized interest. Plaintiffs fail to satisfy either of the requirements at issue.

### 1. *Violation of a procedural right designed to protect plaintiffs' interests*

Appellants fail to show that a procedural right *sufficient for standing* has been violated. Not all procedural-rights violations are sufficient for standing; a plaintiff must show that "the procedures in question are *designed* to protect some threatened concrete interest *of his* that is the ultimate basis of his standing." *Lujan*, 504 U.S. at 573 n.8 (emphases added).

With respect to the organizational plaintiffs, the procedural rights at issue are clearly insufficient for standing, as the procedures at issue were not designed to protect "some threatened concrete interest of" *the organizations*. The No Child Left Behind Act required the Secretary to "select individuals to participate in such process from among individuals or groups

that provided advice and recommendations, including representation from all geographic regions of the United States, in such numbers as will provide an equitable balance between representatives of parents and students and representatives of educators and educational officials." 20 U.S.C. § 6571(b)(3)(B). Nowhere does the Act make mention of advocacy organizations' interests. The only interests arguably enjoying implicit protection here are those of parents, students, educators and education officials; although the advocacy groups may be "representatives" of parents and students, the *interests* to be protected are those of the parents and students, not of the organizations.

Even in the case of the individual plaintiff, Lindsey, it is not at all clear that the Act's procedures regarding the negotiated rulemaking process were "designed to protect" the interests of parents and students. The structure of § 6571 as a whole shows that Congress manifestly did not endorse "protective" litigation regarding the formation of the committee amidst the time-limited rulemaking process. The Act specifically mandated that "[s]uch [rulemaking] process shall be conducted in a timely manner to ensure that final regulations are issued by the Secretary not later than 1 year after January 8, 2002[.]" 20 U.S.C. § 6571(b)(4)(A). And, as noted above, the Act created a complex process for crafting federal and state regulations that would affect parents' and students' interests, including the Act's provision for the selection of an "equitable balance" of committee members. These provisions do not offer any promise of purposeful protection of the concrete interests of students and parents. Appellants cite the Conference Report for evidence that "Congress sought to 'ensu[re] that the views of both program beneficiaries and program providers are fairly heard and considered.'" Brief for Appellants at 9 (quoting H.R. CONF. REP. 107-334, at 809, *reprinted in* 2001 U.S.C.C.A.N. 1230, 1352). This is not persuasive evidence of protective design. To the

extent that the legislative history is relevant to the question before us, we note that the language of the report does *not* support Appellants' position; if anything, it weighs against it: "The Conferees do not intend this language to require strict numerical equality or comparability among these representatives. Rather, the Conferees intend the Secretary to have flexibility in selecting the [committee members.]" H.R. CONF. REP. 107-334 at 809.

With respect to the organizational plaintiffs, the NCLBA clearly did not create procedural rights designed to protect their concrete interests. With respect to Lindsey, the NCLBA did not clearly create such a right; but as the next section of this standing analysis makes clear, even if NCLBA did create such a right, she has not suffered injury sufficient to establish standing.

### 2. *Injury to a concrete, particularized interest*

Appellants present a variety of alleged "injuries" as a result of the Secretary's selection of committee members. Appellants argue that the individual plaintiff, parent Rachelle Lindsey, has suffered three injuries as a result of the Secretary's selection of committee members: First, she was deprived of her procedural right to help shape the final rules. Brief for Appellants at 16. Second, the final rules increased the "risk" that her children will be denied the benefit of the best-possible education and those rules were caused by the committee selection. *Id.* at 17. Third, the final rules fail to require States to provide for public participation in the creation of standards and measures under the Act, and those final rules were caused by the committee selection. *Id*.

Appellants also argue that the organizational plaintiffs have suffered four injuries as a result of the Secretary's selection of

committee members: First, the Secretary's apportionment of committee seats among representatives of various interests reduced their chances of serving on the committee. *Id*. at 16. Second, the selection excluded parent and student advocacy organizations from consideration. *Id*. Third, the final rules forced them to address advocacy issues on an expensive State-by-State basis. *Id*. at 17. Fourth, the final rules failed to require States to provide for public participation. *Id*.

Taken together, Appellants allege four basic categories of injuries:

(1) Injuries to Plaintiff Lindsey caused by the final rules, following selection of the committee members;

(2) Injuries to Plaintiff Lindsey caused by the Secretary's abridgment of her procedural rights in the selection of committee members;

(3) Injuries to Plaintiff Organizations caused by the final rules, following selection of the committee members; and

(4) Injuries to Plaintiff Organizations caused by the Secretary's abridgment of their procedural rights in the selection of committee members.

To organize Appellants' alleged injuries in this fashion reveals what Appellants' muddled brief obfuscates: Appellants allege two classes of injury under a Procedural Rights theory of standing. Appellants allege injuries to Appellants' procedural rights *per se*, and they allege injuries to their particularized interests caused by the final rules. We consider these classes of

injuries in turn.[1]

### a. *Injury to their procedural interests*

Appellants first allege that they suffered injury, as a result of the Secretary's failure to abide by the procedures prescribed by the Act, to their interest in the government's protection of their procedural rights.

As this Court sitting *en banc* described at length in *Florida Audubon Society*, a procedural-rights plaintiff must demonstrate standing by "show[ing] not only that the defendant's acts omitted some procedural requirement, but also that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest." 94 F.3d at 664-65. In other words, while we relax the imminence and redressability requirements, the procedural-rights plaintiff must still satisfy the general requirements of the constitutional standards of particularized injury and causation. *See id.* at 664. Although Appellants rely heavily on footnote 7 of *Lujan* in arguing procedural standing in this case, even in that case the Court required a showing that "concrete interests" had been invaded. 504 U.S. at 572 n.7.

---

[1] Appellants do not argue that the organizational plaintiffs retain "representational standing" to press claims on behalf of individual members of the organization. Nonetheless, this Court notes in its own jurisdictional inquiry that these organizational plaintiffs would not satisfy the test for representational standing, because such plaintiffs would need to show actual or imminent injury to their members caused by the challenged action. *Warth v. Seldin*, 422 U.S. 490, 511 (1975). As we discuss below, Appellants fail to show any such causation here.

Assuming *arguendo* that a procedural right designed to protect a concrete interest of the Appellants has been violated here, Appellants fail to demonstrate how they suffer actual injury to a concrete, particularized interest, caused by the challenged conduct. The chain of causation between the alleged procedural violation and the concrete interest is speculative at best. *See infra* pages 16-17. "Unadorned speculation will not suffice to invoke the judicial power." *Physicians Ed. Network v. Dep't of H.E.W.*, 653 F.2d 621, 627 (D.C. Cir. 1981) (district court's opinion expressly adopted *en toto* by Court) (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 44 (1976)).

But even more importantly, Appellants appear to misunderstand the difference between the "procedural right" and the "concrete interest" in a procedural-rights case. *See*, *e.g.*, Brief of Appellants at 23 ("The Department's denial of this right constitutes sufficient injury to support standing."). The two things are not one and the same. Appellants must show *both* (1) that their procedural right has been violated, *and* (2) that the violation of that right has resulted in an invasion of their concrete and particularized interest. "[A] prospective plaintiff must demonstrate that the defendant caused the particularized injury, and *not just* the alleged procedural violation." *Fla. Audubon Soc'y*, 94 F.3d at 664 (emphasis added). In *Lujan* the Supreme Court disclaimed Appellants' conflation of concrete interest and procedural right in unambiguous language:

> If we understand this [argument] correctly, it means that the Government's violation of a certain . . . class of procedural duty satisfies the concrete-injury requirement by itself, without any showing that the procedural violation endangers a concrete interest of the plaintiff (apart from his interest in having the procedure observed). We cannot agree.

504 U.S. at 573 n.8. Appellants must allege injury beyond mere procedural misstep *per se* to satisfy standing in a procedural-rights case, and they fail to do so here.

In sum, we hold that Appellants have failed to show that the alleged procedural violation caused actual injury to Appellants' concrete interests such that they satisfy Article III's requirement of standing. *Fla. Audubon Soc'y*, 94 F.3d at 664.

      b. *Injuries to other interests, caused by the final rules*

Appellants allege injury not only to their procedural interest, but also to their interests in education, lobbying, and other interests apart from procedural rights *per se*. Even assuming *arguendo* that their purported interests do constitute particularized, concrete interests sufficient to satisfy *Lujan*, *see* 504 U.S. at 560, Appellants fail to demonstrate the necessary causal connection between the challenged agency action–here, the promulgation of final rules–and the alleged injury.

To demonstrate standing, Appellants must show "a causal connection between the injury and the conduct complained of–the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560-61 (quoting *Simon*, 426 U.S. at 41-42).

To show causation and redressability in their procedural-rights case, Appellants need not demonstrate that, but for the procedural defect, the final outcome of the rulemaking process would have been different, and that this Court's ordering the action to remedy the procedural defect *will* alter the final effect on Appellants' interests. *See Lujan*, 504 U.S. at 572 n.7. In short, this Court assumes the causal relationship between the

procedural defect and the final agency action. Nonetheless, Appellants must still demonstrate a causal relationship between the final agency action and the alleged injuries.[2]

In the case of Lindsey, the agency action and the alleged injury stand at opposite ends of a long chain: (1) DOE promulgated final rules giving discretion to the States to implement their own rules for the education of children in the State; (2) the State of Illinois, in its discretion, implemented rules that were permitted but not required by DOE; (3) those rules increased the risk of improper evaluation of students and schools; (4) Lindsey's daughter's school might be improperly classified as a result (though it presently receives federal funding under the NCLBA); (5) Lindsey's daughter might thereby be harmed by improper classification.

Having outlined the alleged causal chain, we conclude that the connection between the beginning and end of the purported chain remains so attenuated that we cannot hold the alleged

---

[2] We note that where, as here, the purported cause of injury (i.e., promulgation of final rules) and the injury itself is separated by intervening actors and events, the causation and redressability inquiries may appear to merge.

> In such cases, both prongs of standing analysis can be said to focus on principles of causation: fair traceability turns on the causal nexus between the agency action and the asserted injury, while redressability centers on the causal connection between the asserted injury and judicial relief. *Despite these similarities, however, each inquiry has its own emphasis.* Causation remains inherently historical; redressability quintessentially predictive.

*Freedom Republicans v. FEC*, 13 F.3d 412, 418 (D.C. Cir. 1994) (citations omitted) (emphasis added).

injury to be "fairly traceable to" the final agency rules "and not the result of the independent action" of the State of Illinois. *Lujan*, 504 U.S. at 560. Where "the necessary elements of causation and redressability . . . hinge on the independent choices of the regulated third party," i.e. the States, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 938 (quoting *Lujan*, 504 U.S. at 562) (internal quotation marks omitted). Appellants fall far short of carrying their burden.

Moreover, the Court is not convinced that the alleged injury to Lindsey is "concrete and particularized." *Lujan*, 504 U.S. at 560. Appellants allege direct injury styled as "increased risk," in the form of giving the States the opportunity to injure Appellants' interests. This so-called "injury" is insufficient for standing.

Outside of increased exposure to environmental harms, hypothesized "increased risk" has never been deemed sufficient "injury."[3] And even if "risk" were sufficient injury for standing in the non-environmental context, Lindsey would have to show

---

[3]We do not read *Electric Power Supply Ass'n v. FERC*, No. 03-1182, 2004 WL 2828047 (D.C. Cir. Dec. 10, 2004), to extend the "enhanced risk" analysis. That case dealt with standing to challenge a federal agency's arguably *ultra vires* publications of regulations purporting to authorize ex parte communications in violation of the Sunshine Act, Pub. L. No. 94-409, 90 Stat. 1241 (1976). While in a sense a violation of rights protected by that statute could be called procedural, in the final analysis, the violation supporting standing goes to substantive rights created under the Act. *Electric Power Supply Association*'s analysis of standing to assert those rights is not authority for the general proposition of applicability of "enhanced risk" analysis to procedural violations in the determination of standing.

that the challenged conduct has created a *"demonstrably* increased risk" that "actually threatens the plaintiff's particular interests." *Fla. Audubon Soc'y*, 94 F.3d at 667 (emphasis added). Here, Lindsey has hypothesized that the final agency rules have increased the risk to her interests, but she has offered this Court no actual demonstration of increased risk.

Indeed, were all purely speculative "increased risks" deemed injurious, the entire requirement of "actual or imminent injury" would be rendered moot, because all hypothesized, non-imminent "injuries" could be dressed up as "increased risk of future injury."

With respect to the organizational plaintiffs, the causal chain between the challenged rules and the alleged injury is not so attenuated: The organizations allege that the Federal rules force them to change their lobbying strategies, a more costly form of lobbying. But while their causal chain may be more traceable than Lindsey's, it fails to bind the challenged conduct to actual injury. This Court has not found standing when the only "injury" arises from the effect of the regulations on the organizations' lobbying activities (as opposed to the effect on non-lobbying activities): "[C]onflict between a defendant's conduct and an organization's mission is alone insufficient to establish Article III standing. Frustration of an organization's objectives is the type of abstract concern that does not impart standing." *Nat'l Treas. Employees Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996) (citation and internal quotation marks omitted).

The case before us is easily distinguished from *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). There, the Court held that an organization dedicated to promoting equal-access to housing had standing to challenge defendants' practice of steering prospective tenants away, because defendants' practice

19

"perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income home-seekers . . . ." *Id.* at 379. Here, the only "service" impaired is pure issue-advocacy–the very type of activity distinguished by *Havens*. *See id.* at 379 (distinguishing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)).[4]

In sum, Appellants fail to demonstrate standing arising from the effect of the final rules, with respect to either the individual

---

[4] In *Sierra Club*, the Supreme Court recognized that to hold that a lobbyist/advocacy group had standing to challenge government policy with no injury other than injury to its advocacy would eviscerate standing doctrine's actual injury requirement:

> It is clear that an organization whose members are injured may represent those members in a proceeding for judicial review. *See*, *e.g.*, *NAACP v. Button*, 371 U.S. 415, 428 [1963]. But a mere "interest in a problem," no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization "adversely affected" or "aggrieved" within the meaning of the APA. The Sierra Club is a large and long-established organization, with a historic commitment to the cause of protecting our Nation's natural heritage from man's depredations. But if a "special interest" in this subject were enough to entitle the Sierra Club to commence this litigation, there would appear to be no objective basis upon which to disallow a suit by any other bona fide "special interest" organization, however small or short-lived. And if any group with a bona fide "special interest" could initiate such litigation, it is difficult to perceive why any individual citizen with the same bona fide special interest would not also be entitled to do so.

405 U.S. at 739-40.

or organizational plaintiffs.

### III. Conclusion

Because we hold that Appellants lack standing to challenge the Secretary's selection of committee members, this Court and the District Court lack jurisdiction to hear Appellants' claims. And because we have already recognized our lack of jurisdiction, we will not consider whether the No Child Left Behind Act incorporates the Negotiated Rulemaking Act's § 570 bar on judicial review of committee formation. "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle*, 74 (7 Wall.) 506, 514 (1868), *quoted in Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998).

We affirm the District Court's judgments of dismissal.

EDWARDS, *Circuit Judge*, *concurring in the judgment in part*: The No Child Left Behind Act ("NCLBA" or "Act"), Pub. L. No. 107-110, 115 Stat. 1425 (2001) (relevant sections codified at 20 U.S.C. §§ 6301-6578 (Supp. I 2001)), was enacted to enhance the educational opportunities of all children and ensure their ability to meet challenging academic standards. The Act permits schools to exercise "greater decisionmaking authority . . . in exchange for greater responsibility for student performance," 20 U.S.C. § 6301(7), as monitored through state testing and accountability systems that comply with specific standards set out in 20 U.S.C. § 6311. Students in schools that consistently fail to meet target performance levels are entitled to supplemental educational services and the option to transfer to other public schools. *Id*. § 6316.

The Act envisions parents as an integral part of achieving high-quality results and provides for parental participation from the inception of the implementing regulations through the development of state plans regarding assessments and accountability systems. *See id*. §§ 6571, 6311. To implement the NCLBA, the Secretary of Education ("Secretary") is required to "establish a negotiated rulemaking process on, at a minimum, standards and assessments," *id*. § 6571(b)(3)(A), and "select individuals to participate in such process . . . in such numbers as will provide an equitable balance between representatives of parents and students and representatives of educators and education officials," *id*. § 6571(b)(3)(B).

Rachelle Lindsey is a parent of two children who attend a school that has been identified as a "school in need of improvement" under the NCLBA. She alleges that the Department of Education ("Department") failed to observe the "equitable balance" requirement of § 1901 of the NCLBA, 20 U.S.C. § 6571, in selecting the members to participate in the negotiated rulemaking process. In particular, she contends that this Committee did not include an adequate number of representatives of parents and students. She also contends that

the implementing regulations, which originated with the Committee, have placed at risk her children's capacity to obtain the full benefits of the Act.

Two questions are presented on this appeal. The first question is whether any challenge to the composition of the Committee is subject to judicial review. The second question is whether any of the appellants in this case have standing to pursue such a challenge. I believe that the District Court erred in holding that judicial review of the Committee's composition is barred; however, on the record at hand, I find that appellants lack standing to bring this case.

## I. *THE SECRETARY'S SELECTION OF PARTICIPANTS FOR THE NEGOTIATED RULEMAKING PROCESS PRESCRIBED BY THE NCLBA IS CLEARLY SUBJECT TO JUDICIAL REVIEW*

The Department asserts that this court lacks jurisdiction over appellants' claims, because judicial review is barred. In advancing this contention, the Department argues that the NCLBA incorporates § 570 of the Negotiated Rulemaking Act, which provides in part:

> Any agency action relating to establishing, assisting, or terminating a negotiated rulemaking committee under this subchapter shall not be subject to judicial review. Nothing in this section shall bar judicial review of a rule if such judicial review is otherwise provided by law.

5 U.S.C. § 570 (2000). The Department's argument is entirely without merit. The NCLBA does not incorporate § 570 of the Negotiated Rulemaking Act. And, even if it did, § 570 does not bar review of the present suit.

The NCLBA plainly does not incorporate the Negotiated Rulemaking Act in its totality. Indeed, the NCLBA mandates a negotiated rulemaking process, *see* 20 U.S.C. § 6571(b)(3), while the Negotiated Rulemaking Act leaves the decision whether to engage in such process to the discretion of the agency, *see* 5 U.S.C. §§ 563, 565 (2000). The NCLBA also prescribes particular steps for selecting participants in the negotiated rulemaking process, *see* 20 U.S.C. § 6571(b)(3), whereas the Negotiated Rulemaking Act has no such prescriptions. The NCLBA only looks to the Negotiated Rulemaking Act to guide the "process" of negotiated rulemaking. This is apparent from the language and structure of the relevant provisions of the two acts.

The NCLBA directs the Secretary to establish a negotiated rulemaking process, 20 U.S.C. § 6571(b)(3)(A), and to "select individuals *to participate in such process* . . . in such numbers as will provide an equitable balance between representatives of parents and students and representatives of educators and education officials," 20 U.S.C. § 6571(b)(3)(B) (emphasis added). The next paragraph of § 6571, titled "Process," explains that "[s]uch process – . . . shall not be subject to the Federal Advisory Committee Act, but shall otherwise follow the provisions of the Negotiated Rulemaking Act of 1990." 20 U.S.C. § 6571(b)(4)(B). Thus, § 6571 first prescribes that the Secretary establish a negotiated rulemaking process and provides instructions for the selection of persons to participate in that process. It then directs that the *process* of negotiated rulemaking shall follow the prescriptions of the Negotiated Rulemaking Act, such as the consensus requirement contained in 5 U.S.C. § 566 (2000). It is therefore clear that, under the NCLBA, questions concerning the selection of the Committee are completely distinct from how the Committee members participate in the negotiated rulemaking process. Judicial

review is foreclosed only with respect to the process of negotiated rulemaking.

Furthermore, nothing in the language, structure, or legislative history of the Negotiated Rulemaking Act purports to bar judicial review of procedural requirements imposed by other statutes. In fact, it expressly states the opposite. First, § 570 of the Negotiated Rulemaking Act is explicit that "[a]ny agency action relating to establishing . . . a negotiated rulemaking committee *under this subchapter* shall not be subject to judicial review." 5 U.S.C. § 570 (emphasis added). The NCLBA Committee is not established "under [the] subchapter" in which the Negotiated Rulemaking Act is located. Indeed, establishing a negotiated rulemaking committee "under [that] subchapter" is a discretionary act, 5 U.S.C. § 565, which follows consideration of multiple factors enumerated at 5 U.S.C. § 563(a). In contrast, establishing the Committee under the NCLBA is mandatory, and must follow specific steps contained in 20 U.S.C. § 6571(b)(3). Clearly, then, the Committee established under 20 U.S.C. § 6571(b)(3) is not a committee established under the Negotiated Rulemaking Act.

Second, where, as here, review of an alleged procedural violation in the context of final rule review is permitted by the Administrative Procedure Act ("APA"), the savings clause of § 570 explicitly permits such review: "Nothing in this section shall bar judicial review of a rule if such judicial review is otherwise provided by law." 5 U.S.C. § 570. The legislative history of the Negotiated Rulemaking Act is explicit that the savings clause of § 570 was intended to preserve rights available under the APA. The Senate Report states:

> Persons wishing to challenge a rule derived from the work of a negotiated rulemaking committee would retain all

> rights they presently possess under the APA to obtain judicial review of that rule.

> [The bill] recognizes and maintains the long tradition in federal administrative law which authorizes judicial review of agency rules at the time those rules are promulgated. The bill merely precludes judicial intervention in the earlier stages of the regulatory process, when a negotiated rulemaking is underway.

S. REP. NO. 101-97, at 28 (1989). Contrary to the District Court's analysis, the House Report is also consistent with this interpretation. It explains that "[a]gency decisions to establish a negotiated rulemaking committee or regarding the makeup of this [sic] membership are not subject to judicial review." H.R. REP. NO. 101-461, at 15 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6697, 6706. It makes perfect sense that discretionary decisions whether to establish a negotiated rulemaking committee under the Negotiated Rulemaking Act are nonreviewable. This says nothing about the reviewability of binding directives to establish such committees under other statutes.

The District Court's misunderstanding of the relationship between the NCLBA and the Negotiated Rulemaking Act stems in part from its peculiar phrasing of the question presented. The court considered whether § 570's bar on judicial review lapses when final rules are promulgated, and identified tension between the plain language of § 570 and a temporal limitation on the prohibition of judicial review; it also expressed concern that reading the prohibition contained in the first sentence of § 570 as lapsing when final rules are promulgated renders § 570 superfluous because the APA already bars review prior to final agency action. *See Ctr. for Law & Educ. v. United States Dep't of Educ.*, 315 F. Supp. 2d 15, 32-33 (D.D.C. 2004). The properly framed question, however, is whether the savings

clause of § 570 permits review under the APA, which grants jurisdiction to review a final agency action, and allows for review of procedural violations at that time. *See* 5 U.S.C. §§ 704, 706(2)(D).

Approaching the issue in this way alleviates the District Court's concerns. First, the plain language of the savings clause is consistent with permitting review under the APA. Second, triggering the savings clause does not render the first part of § 570 superfluous. Indeed, intermediate agency action pursuant to the Negotiated Rulemaking Act remains unreviewable under the APA *because of* the first part of § 570, which provides a clear statement barring judicial review of alleged violations of the Negotiated Rulemaking Act, thereby overcoming the APA's presumption of reviewability. There also is no basis for attacking regulations produced under the Negotiated Rulemaking Act unless another statute expressly creates such a basis.

In sum, nothing in § 570 of the Negotiated Rulemaking Act proscribes review of procedures mandated by the NCLBA for establishing the Committee. Even if § 570 were improbably construed to have such meaning, it is evident from the language and structure of § 1901 of the NCLBA that the Act incorporates provisions of the Negotiated Rulemaking Act only to the extent that those provisions determine the process of an already established Committee. Such a construction clearly prevents § 570 from determining reviewability in this case.

## II. *APPELLANTS HAVE NO STANDING*

Although there is no statutory bar to judicial review of this case, we nonetheless lack jurisdiction over this matter because appellants have no standing.

In order to establish Article III standing, a plaintiff must demonstrate that (1) she has suffered an injury-in-fact, (2) which is fairly traceable to the defendant's purported unlawful conduct, and is not the result of an independent action of a third party not before the court, and (3) is likely to be redressed by a favorable decision of the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). In *Defenders of Wildlife*, the Supreme Court fortified standing doctrine. It provided for precise notions of injury-in-fact grounded in concrete and imminent harm and of redressability rooted in an uninterrupted causal chain. *See id.* at 562-71. It is especially significant, therefore, that *Defenders of Wildlife* simultaneously embraced an expansive view of standing in the context of procedural rights: "[S]o long as the procedures in question are designed to protect some threatened concrete interest of [the plaintiff's]," *id.* at 573 n.8, "[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy," *id.* at 572 n.7. In other words, "'procedural rights' are special." *Id.* This is because they are prophylactic in nature. Such requirements reflect Congress's reasonable judgment that a government decision will better protect particular interests with the specified procedures in place.

Consistent with the unique role of procedural rights in contemporary statutory schemes, a procedural rights plaintiff must establish that (1) the procedural requirement was designed to guard her concrete interests; and (2) the government conduct, performed in the absence of that procedure, will cause a distinct risk to her particularized interests.

In applying these principles to the instant case, I concur in the judgment that the organizational plaintiffs lack standing to pursue their claims. The majority opinion needs no amplification on this point.

The question whether Lindsey has standing to seek judicial enforcement of her alleged procedural right to a properly constituted Committee raises a much harder issue. There is not the slightest doubt in the record that this procedural requirement was intended to protect parents' voices on the Committee; and Lindsey contends that the disputed regulations, which allegedly originated in the absence of adequate parental representation, have placed at risk her interest in ensuring that her children are properly assessed so as to receive the full benefits of the NCLBA.

The District Court concluded that Lindsey failed to establish an injury-in-fact because the language of § 1901 does not "expressly bestow upon any person an individual right to enforce his or her construction of an 'equitably balanced' negotiated rulemaking committee." *Ctr. for Law & Educ.*, 315 F. Supp. 2d at 27. This holding is clearly wrong. Because Lindsey brings this suit under the APA, not the NCLBA, the standing inquiry does not turn on rights enforceable independently from the APA, but rather on an independent source of procedural protection – here, § 1901 of the NCLBA – and a risk to concrete interests protected by the procedural requirement.

I also disagree with the statement in the majority opinion suggesting that, in procedural rights cases, "[o]utside of increased exposure to environmental harms, hypothesized 'increased risk' has never been deemed sufficient 'injury'" to satisfy standing requirements. In my view, this statement is not consistent with the applicable case law. Most recently, in *Electric Power Supply Ass'n v. FERC*, No. 03-1182, 2004 WL 2828047 (D.C. Cir. Dec. 10, 2004), we held that the Electric Power Supply Association ("EPSA") had standing "to enforce procedural requirements designed to protect [its] concrete interest in the outcome of hearings to which [it was] a party."

*Id*. at *5. Specifically, EPSA had standing to challenge FERC's new exemptions regarding *ex parte* communications even though there was no guarantee that impermissible *ex parte* contacts would in fact materialize:

> In complaining that the market monitor exemption violates the Sunshine Act, EPSA is seeking to enforce procedural requirements designed to protect EPSA's concrete interest in the outcome of hearings to which EPSA is a party. That being the case, EPSA's standing is not defeated by the fact that it cannot show, with any certainty, that its or its members' financial interests will be damaged by the operation of the [rule limiting the proscription against *ex parte* communications in agency hearings].

*Id.* The holding of *Electric Power* follows the well-established law of this circuit. *See id*. at *6.

As noted above, there is no doubt that a "person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Defenders of Wildlife*, 504 U.S. at 572 n.7. However, "in cases involving alleged procedural errors, the plaintiff must show that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff." *Wyo. Outdoor Council v. United States Forest Serv*., 165 F.3d 43, 51 (D.C. Cir. 1999) (internal quotation marks and citation omitted). Lindsey has failed to do this. The injury that she alleges is so attenuated that she fails to demonstrate that "the procedural violation endangers a concrete interest . . . (apart from [her] interest in having the procedure observed)." *Defenders of Wildlife*, 504 U.S. at 573 n.8.

This court looks to a two-part nexus to establish the requisite relationship between the alleged procedural irregularity, the substantive government decision, and the concrete interests of the procedural rights plaintiff. Consistent with the prophylactic nature of procedural rights, a litigant seeking to enforce such rights must, first, show that the omitted procedure is linked to a substantive government decision or act, *see City of Waukesha v. EPA*, 320 F.3d 228, 234 (D.C. Cir. 2003) (per curiam), and, second, "that the government act performed without the procedure in question will cause a distinct risk to [her] paricularized interest," *Wyo. Outdoor Council*, 165 F.3d at 51 (internal quotation marks and citation omitted). Procedural requirements serve their prophylactic function irrespective of whether the ultimate Government decision is consistent with views that emerge through the requisite process. Thus, under the first part of the causal nexus requirement, "[a] plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered. All that is necessary is to show that the procedural step was connected to the substantive result." *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002). Lindsey's problem lies not with this first prong, but the second. She has failed to establish any causal relationship between the substantive Government decision that she desires and a concrete, personal interest.

Lindsey is a parent of two children who attend John Foster Dulles Elementary School, a public school in Chicago that has been identified as a "school in need of improvement" under the NCLBA. She contends that the Department violated her procedural right to equitable representation on the Committee, and that the Department's implementing regulations, which originated in the allegedly improperly constituted Committee, increase the risk that her children will be incorrectly assessed

and therefore denied the full benefits of the NCLBA. *See Ctr. for Law & Educ.*, 315 F. Supp. 2d at 26, 29 (citing Pls.' Opp'n). Lindsey, however, does not contend that the disputed regulations violate the NCLBA. Indeed, at oral argument, Lindsey's counsel conceded that the regulations do not violate the statute. *See* Recording of Oral Argument at 7:30-:40. Lindsey's claim, then, is that the regulations *might* have been qualitatively better if the Committee had been properly constituted and this *might* have resulted in the state adopting qualitatively better educational assessment programs which, in turn, *might* have benefitted her children.

Lindsey's argument cannot succeed. First, it is far from clear that she has demonstrated a cognizable *concrete interest* sufficient to satisfy Article III standing. Second, even assuming that her interest in her children's education has some content that makes it sufficiently concrete to be cognizable, she has failed to demonstrate that there is any causal relationship between the disputed regulations and her asserted interest. In short, Lindsey has failed to show that the alleged procedural violation endangers a concrete interest apart from her interest in having the procedure observed. I therefore agree with the majority that she lacks standing.